# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JOSEPH ANTONETTI,

    Plaintiff,

v.                                                                          Civ. No. 21-1202 MIS/GJF

JOHN GAY, *et al.*,

    Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

THIS MATTER is before the Court on the *Martinez* Report filed on June 30, 2023, by New Mexico Corrections Department ("NMCD") Director John Gay, Cabinet Secretary Alisha Lucero, Penitentiary of New Mexico ("PNM") Warden Leon Martinez, Warden David Gonzalez, Unit Manager Robert Sanchez, Grievance Officer Janine Rodriguez, Unit Manager Lovato, Sergeant Sanchez, Lieutenant Ortiz, Lieutenant Morris, Mailroom Officer Denis Mares, Mailroom Administrator James Yates, and Property Sergeant Romero (collectively "Corrections Defendants") [ECF 37–39], and on six motions filed by Corrections Defendants on August 21, 2023:  (1) Motion for Partial Summary Judgment to Dismiss Plaintiff's Claims for Failure to Exhaust Administrative Remedies ("Exhaustion Motion") [ECF 57]; (2) Motion for Summary Judgment to Dismiss Plaintiff's Civil Rights Complaint on Qualified Immunity Grounds ("Qualified Immunity Motion") [ECF 61]; (3) Motion for Partial Summary Judgment on Plaintiff's First Amendment Claims ("First Amendment Motion") [ECF 58]; (4) Motion for Partial Summary Judgment to Dismiss Plaintiff's Eighth Amendment Violation Claims ("Eighth Amendment

---

[1] The undersigned files this Proposed Findings and Recommended Disposition pursuant to the presiding judge's Order of Reference, which was entered November 7, 2022. ECF 8.

Motion") [ECF 60]; (5) Motion for Partial Summary Judgment on Plaintiff's Fourteenth Amendment Claims ("Fourteenth Amendment Motion") [ECF 59]; and (6) Motion to Strike Exhibits from the Summary Judgment Record ("Motion to Strike Plaintiff's Exhibits") [ECF 62].

Also before the Court are Motions filed by Plaintiff:  Motion for Recusal [ECF 50], filed July 27, 2023; Motion to Strike Counter Motion to Strike [ECF 94], filed December 20, 2023; and Motion for Protective Order and Extension of Time [ECF 97], filed January 10, 2024.[2]

For the reasons that follow, the Court **HEREBY RECOMMENDS** that Plaintiff's Motion for Recusal [ECF 50], Motion to Strike Counter Motion to Strike [ECF 94], and Motion for Protective Order [ECF 97] be **DENIED**. The Court **FURTHER RECOMMENDS** that Corrections Defendants' Exhaustion Motion [ECF 57] be **GRANTED IN PART** and that Counts VII and X of Plaintiff's Complaint be **DISMISSED WITHOUT PREJUDICE**. The Court **RECOMMENDS** that Corrections Defendants' Motion to Strike Plaintiff's Exhibits [ECF 62] be **GRANTED IN PART** as discussed herein and **DENIED AS MOOT** in all other respects. As to Corrections Defendants' Qualified Immunity Motion [ECF 61], the Court **RECOMMENDS** that the Motion be **GRANTED** and that Counts I-VI[3] of Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**. The Court **FINALLY RECOMMENDS** that Corrections Defendants' First

---

[2] Although Plaintiff did not file replies to these motions, the time for doing so has passed, and the Court considers these motions ripe for resolution. *See* D.N.M. LR-Civ. 7.4(a).

[3] In his October 28, 2022 Supplement, Plaintiff notes that "it appears pg. 5, Count VIII is missing from this Complaint." ECF 7 at 13. Plaintiff explains that he "believes this was a count about 'STG' Security Threat Group Application put on [him] by 'John Doe' 'STIU Officers'" and that "this application is used on a 'point system' that contributes to [his] segregated confinement." ECF 7 at 13. Beyond his reference to what he "believes" this count addressed, Plaintiff does not otherwise identify any factual or legal basis for Count VIII. *See id.* at 1. Moreover, the Court observes that, in Count II, Plaintiff asserts an as-applied and facial challenge to his placement in PBMP, which he describes as involving conditions amounting to "segregation" and which he argues was made "arbitrarily, without process" and in violation of his right to be free from cruel and unusual punishment. *Id.* at 7–9. As best the Court can surmise from Plaintiff's description, the missing Count VIII to which he refers relates to and is subsumed by Count II. Regardless, the Court will not independently analyze the vague and undeveloped count to which Plaintiff refers, and it recommends that any such claim be dismissed with prejudice based on Plaintiff's failure to state a claim or to satisfy his qualified immunity burden.

Amendment Motion [ECF 58], Eighth Amendment Motion [ECF 60], and Fourteenth Amendment Motion [ECF 59] be **DENIED AS MOOT**.

## I.      INTRODUCTION

Plaintiff Joseph Antonetti, a state prisoner proceeding *pro se*, brings this action under 42 U.S.C. § 1983 against various officials at NMCD and PNM, where he was incarcerated in the Predatory Behavior Management Program ("PBMP") from November 23, 2020, to November 24, 2021. *See* ECFs 1; 7. In the claims that remain in this action,[4] each of which relate to Plaintiff's conditions of confinement, Plaintiff seeks damages and injunctive relief from thirteen Corrections Defendants, who are associated with NMCD and PNM. ECF 1. Broadly speaking, Plaintiff alleges that these Defendants violated his constitutional rights and various federal statutory rights by depriving him of outdoor recreation, the ability to practice his religion, access to the courts, an adequate law library, unfettered access to his mail, adequate hygiene and cleaning supplies, adequate ventilation and heating and cooling, proper plumbing, in-person visitation, and adequate medical treatment. *See* ECFs 1, 7. As the Court has previously observed, "[c]onstrued liberally, [his] Complaint alleges the supervisory Corrections Defendants failed to train the individual PNM officers and enacted policies (e.g., the PBMP solitary confinement program) that caused the constitutional violations." ECF 6 at 2.

## II.     BACKGROUND AND PROCEDURAL HISTORY

Plaintiff filed his *pro se* Complaint on December 17, 2021, asserting ten counts and numerous constitutional violations. ECF 1. On October 12, 2022, the Court entered a

---

[4] Plaintiff's Complaint also names "John Does 1-20" who resided at PNM, and three defendants not associated with the prison: New Mexico Governor Michelle Lujan Grisham, President Joseph Biden, and the Internal Revenue Service ("IRS"). *See* ECF 1. The Court discusses the fate of these claims below. *See infra* Part II.

Memorandum Opinion and Order in which it determined that Plaintiff sufficiently asserted constitutional claims against the Corrections Defendants to survive initial review under 28 U.S.C. § 1915(e)(2). *See* ECF 6 at 2. Although Plaintiff's Complaint also asserted claims against three defendants not associated with the prison, including New Mexico Governor Michelle Lujan Grisham, President Joseph Biden, and the Internal Revenue Service ("IRS"), the Court found that Plaintiff's "Complaint fail[ed] to state a cognizable claim against" these defendants. *Id*. at 3. The Court dismissed with prejudice Plaintiff's claims against President Biden based upon absolute immunity and dismissed with leave to file a supplement the claims against Governor Lujan Grishm and the IRS. *Id*.

As to Plaintiff's claims against Governor Lujan Grisham, the Court found that there were no credible allegations in Plaintiff's Complaint that the Governor was personally involved in Plaintiff's confinement at PNM or that she was responsible for administering the PBMP about which Plaintiff complained. *Id*. Plaintiff filed a Supplement to his Complaint on October 28, 2022, in which he alleged that he and civilian friends wrote letters and called Governor Lujan Grisham and that she was therefore "aware of the many, many violations occurring in New Mexico Prisons." ECF 7 at 3. Plaintiff's supplemental filing notwithstanding, there remain no credible allegations that Governor Lujan Grisham was personally involved in Plaintiff's confinement at PNM or that give rise to a cognizable claim against her. *See id*.; *see also Trask v. Franco,* 446 F.3d 1036, 1046 (10th Cir. 1998) (reasoning that a § 1983 plaintiff must allege that each government official, through the official's own individual actions, has personally violated the Constitution). The Court therefore recommends that any such claims be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B) (providing that the Court may dismiss a complaint at any time if it determines the action fails to state a claim for relief or is frivolous or malicious).

With respect to Plaintiff's claim against the IRS, the Court previously observed that it was unclear whether Plaintiff alleged that the "IRS misdirected/denied [his] stimulus checks or whether the checks were lost as a result of PNM's mail interference." ECF 6 at 3. On initial screening, the Court declined to order the IRS to respond to Plaintiff's Complaint. *Id*. In his Supplement, Plaintiff alleges that he "has written the IRS dozens of letters and filed for 'refund' both on paper and electronically since 2019[,] and . . . they claim to have deposited [his] stimulus [checks] x 2 . . . in an account somewhere called Sutton Bank." ECF 7 at 9. Plaintiff further alleges that "outside assistance who has control[] of account looked and no deposit was ever made and Sutton Bank is supposed to be investigating." *Id*. at 9. As before, the Court concludes that Plaintiff's claims regarding the non-receipt of IRS stimulus checks remain unclear and undeveloped and do not state a cognizable claim against the IRS. The Court therefore recommends that these claims also be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

Plaintiff's Complaint also names "John Does 1-20" who "reside[] at PNM-N." ECF 1 at 2. At initial screening, the Court declined to dismiss these claims, explaining that "Plaintiff may identify additional John Doe defendants within a reasonable time, and prior to any dispositive ruling on summary judgment." ECF 6 at 4. The Court explained that if John Does were so identified, Plaintiff should file a separate motion seeking service on them and/or a separate motion seeking discovery, if necessary. *Id*. Plaintiff has not identified the John Doe defendants residing at PNM, and the Court therefore recommends dismissal of these Defendants at this time. *See* 28 U.S.C. § 1915(e)(2)(B).

On June 30, 2023, Corrections Defendants filed their *Martinez* Report, which includes relevant NMCD policies, maintenance records for Plaintiff's cells, numerous affidavits,[5] grievance records, disciplinary records, classification records, mail records, medical records, and Plaintiff's inmate file. *See* ECF 37. Corrections Defendants' five summary judgment motions followed. ECF 57–61. Plaintiff responded in a singular, thirty-three-page brief ("consolidated response brief") [ECF 81], and Corrections Defendants filed independent replies for each of their five motions on [ECFs 85–88, 90]. Also before the Court is Plaintiff's self-styled "Plaintiff *Martinez* Report and Response to Summary Judgment or Dismissal" ("Plaintiff's *Martinez* Report") [ECF 51], to which he attached various exhibits that are now the subject of Corrections Defendants' Motion to Strike Plaintiff's Exhibits [ECF 62].

Neither Plaintiff's *Martinez* Report nor his consolidated response brief comply with this District's Local Rule 56.1, which requires "a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist." D.N.M. LR-Civ. 56.1(b). Local Rule 56.1 further specifies that "[e]ach fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." *Id*. Pursuant to Rule 56.1, material facts are deemed undisputed unless specifically controverted. *Id*. Plaintiff's consolidated response brief broadly states that "[a]ll 'Facts' stated by Defendants are disputed" [ECF 81], but this conclusory statement can hardly be said to satisfy Rule 56.1 or Federal Rule of Civil Procedure 56. Although Plaintiff

---

[5] These include affidavits from Major Michael Baca, the Chief of Security at PNM; Trisha Cox, compliance officer in the Office of General Counsel of NMDC; Sharlene Hagerman, PNM Warden; Robert Mendoza, the physical plan services manager at PNM; Robert Ortiz, the Chaplain at PNM; Janine Rodriguez, the current Statewide Grievance and Disciplinary Appeals Manager for NMCD; Regina Santistevan, mail clerk at PNM; Daniel Sedillo, a unit manager at PNM; and Sean Shannon, the former Deputy Statewide Legal Monitor for NMCD.

scatters record citations throughout his consolidated response brief, the citations are not formatted in the manner Rule 56.1 contemplates. And while his consolidated response brief includes some numbered paragraphs, Plaintiff does not identify to which summary judgment motion—of five— these numbers correspond, leaving the Court and Corrections Defendants to speculate. *See id.*

Even so, given Plaintiff's *pro se* status, the Court has thoroughly reviewed his consolidated response brief and Plaintiff's *Martinez* Report and will address apparent attempts therein to specifically controvert Corrections Defendants' statements of material fact insofar as Plaintiff cites to admissible evidence in the record. In doing so, the Court bears in mind both that Plaintiff's *pro se* pleadings are to be construed liberally but also that it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). With respect to Plaintiff's citations to relevant documents contained in his own *Martinez* Report, the Court also considers the evidentiary objections outlined in Defendants' Motion to Strike Plaintiff's Exhibits.

## III.    PLAINTIFF'S MOTIONS

Before turning to the merits of Plaintiff's claims, the Court takes up three motions filed by Plaintiff in which he seeks, among other things, disqualification of the undersigned for alleged bias, reprieve from briefing deadlines, and a lifting of the discovery stay.

### A.  Plaintiff's Motion to Recuse Magistrate [Judge] Fouratt

Plaintiff asserts that the undersigned should be recused or disqualified from this case because he "is incapable of impartiality." ECF 50 at 1. Although Plaintiff does not cite the applicable statute, the Court construes his Motion to seek relief under 28 U.S.C § 144. Under that statute, when a party files a "timely and sufficient affidavit" demonstrating that the judge assigned

to his case "has a personal bias or prejudice either against him or in favor of any adverse party," a different judge must be assigned to the case. 28 U.S.C. § 144.

According to Plaintiff, the undersigned revealed a predisposition in a June 2, 2023 Proposed Findings and Recommended Disposition ("PFRD"), which recommended denial of his Motion for Temporary Restraining Order. ECF 50 at 1 ("Document 27 shows Fouratt's bias."). Despite the presiding judge's adoption of that PFRD over Plaintiff's objections [*see* ECF 48], he now insists that the PFRD "shows [Judge] Fouratt's bias and inability to apply/follow both state and federal law." ECF 50 at 1. Plaintiff argues, in effect, that the undersigned misread what he considers to be the relevant case law, misunderstood or ignored the evidence he deems critical, and refused to allow discovery. *See id*. at 2–5.  In other words, he attempts to rehash the substance of prior motions on which the Court ruled against him.

Plaintiff fails to demonstrate that he is entitled to relief under § 144.  First, his Motion was neither sworn nor timely. Section 144 requires that a supporting *affidavit* "be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause [be] shown for failure to file it within such time." 28 U.S.C. § 144. Plaintiff waited nearly two months from the filing of the June 2, 2023 PFRD to seek disqualification through an *unsworn motion*. *Compare* ECF 27 (filed June 2, 2023), *with* ECF 50 (filed July 27, 2023). Moreover, Plaintiff's Motion fails to adequately state the "facts and reasons for the belief that bias or prejudice exists." 28 U.S.C. § 144. Instead, Plaintiff offers unparticularized, vague, and speculative allegations. *See, e.g*., ECF 50 at 7 ("Quite plainly, [Judge Fouratt] is of the opinion that 'bad guys in prison shouldn't have rights, associations, and should be punished.'"). He fails to identify *any facts* that would evince prejudice or bias against Plaintiff or in favor of Corrections Defendants. *See generally* ECF 50. Plaintiff's "belie[f]," apparently derived from rulings in this case, that the

undersigned lacks impartiality [*see* ECF 50 at 6] is wholly inadequate to satisfy the dictates of 28 U.S.C. § 144. After all, adverse rulings, in themselves, are no basis for disqualification. *See Green v. Dorrell*, 969 F.2d 915, 919 (10th Cir. 1992). For all of these reasons, the Court recommends that Plaintiff's Motion to Recuse be denied.

### B. Plaintiff's Motion for Protective Order

In this Motion, Plaintiff seeks six forms of relief: (1) a protective order against "overly burdensome" motions practice by Corrections Defendants; (2) an order requiring NMCD to provide him certain supplies for his use in responding to pending motions (e.g., "better pens"); (3) a "stay" pending discovery in this case; (4) a 13-month extension to obtain and read cases cited by Corrections Defendants; (5) appointment of counsel; (6) an order requiring NMCD to give him a "law library laptop that has some case law accessible." *See* ECF 97. The balance of Plaintiff's Motion appears aimed at responding to arguments advanced in Corrections Defendants' dispositive motions. *See id*. But overall, Plaintiff's Motion demonstrates a fundamental misunderstanding of the procedural posture of this case. In lieu of discovery, the Court ordered the Corrections Defendants to file a *Martinez* Report, which they did on June 30, 2023. *See* ECFs 37–39. Corrections Defendants' assertion of a qualified immunity defense then triggered a discovery stay. ECF 42. Thereafter, Corrections Defendants' summary judgment motions were fully briefed, and they are now ripe for resolution.

Insofar as Plaintiff seeks various forms of relief for the purpose of responding to already fully-briefed motions, the Court observes that the Rules of Civil Procedure do not allow further briefing absent the Court's authorization of a sur-reply. *See* D.N.M. LR-Civ. 7.4(b). Plaintiff has not sought leave to file a sur-reply. Moreover, the Court is not inclined to grant Plaintiff accommodations aimed at helping him meet a response deadline that does not exist.

Also in his Motion for Protective Order, Plaintiff urges the Court to permit discovery, which the Court construes as a request to revisit its prior rulings on this matter. *See* ECFs 42 (staying discovery on the basis of Corrections Defendants' forthcoming motion asserting qualified immunity); 78 (denying Plaintiff's Motion to Compel discovery responses given the discovery stay and Plaintiff's failure to make the requisite showing under Fed. R. Civ. P. 56(d)); 80 (granting Corrections Defendants' Motion for Protective Order and giving them 30 days after the Court lifts the discovery stay to respond to Plaintiff's discovery requests). Plaintiff does not demonstrate clear error or other compelling reasons for the Court to reconsider the existing discovery stay. Although he cites seven cases for the proposition that he is entitled to discovery before responding to summary judgment motions, none of these cases are on point and none constitute binding authority. *See Ingle ex rel Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (involving requests for discovery pursuant to Fed. R. Civ. P. 56(d)'s predecessor); *Nauman v. Bugado*, 374 F. Supp. 2d 893, 901 (D. Haw. 2005) (same); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1219 (11th Cir. 2000) (noting the general proposition, *in a non-qualified immunity context*, that summary judgment typically follows the completion of discovery); *LaBounty v. Coughlin*, 137 F.3d 68, 72 (2d Cir. 1998) (same); *Salahuddin v. Coughlin*, 993 F.2d 306 (2d Cir. 1993) (same); *Klingele v. Eikenberry*, 849 F.2d 409, 41213 (9th Cir. 1988) (same).

In sum, because the Court has not authorized a sur-reply to Corrections Defendants' summary judgment motions, and because it concludes the discovery stay should remain in place, the Court recommends that the Motion for Protective Order be denied.

### C.  Plaintiff's Motion to Strike Counter Motion to Strike

Following full briefing on Corrections Defendants' Motion to Strike Plaintiff's Exhibits [*see* ECFs 62, 79, 82–83], Plaintiff filed his own "Motion to Strike Counter Motion to Strike"

[ECF 94]. Corrections Defendants aptly describe this Motion as a "hodgepodge of recycled arguments bundled into one procedurally improper package." ECF 95 at 1. Given that Plaintiff advances further arguments in opposition to Corrections Defendants' Reply in Support of their Motion to Strike, this Motion constitutes an untimely and unauthorized sur-reply. Pursuant to Local Rule, a party must seek leave before filing a sur-reply, *see* D.N.M. LR-Civ. 7.4(b), and the Court may disregard a sur-reply filed without leave. *Brown v. City of Las Cruces Police Dep't*, 347 F. Supp. 3d 792, 802–03 (D.N.M. 2018). Although the Court may be inclined to grant a sur-reply under some circumstances—most notably, when a new issue is raised for the first time in a reply brief, here, Plaintiff offers no rationale for the filing a motion that amounts to a sur-reply. Accordingly, the Court recommends that Plaintiff's Motion to Strike Counter Motion to Strike be denied and disregarded as an unauthorized sur-reply.

## IV.   CORRECTIONS DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The primary issues raised in Corrections Defendants' various summary judgment motions are as follows: (1) whether Plaintiff failed to exhaust his administrative remedies; (2) whether Defendants are entitled to qualified immunity on Plaintiff's § 1983 claims; and (3) whether Corrections Defendants are entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court first considers the threshold issue of whether Plaintiff has exhausted his claims. Then, as to any claims that *were* properly exhausted, the Court turns to the qualified immunity inquiry.

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the

outcome of the suit under the governing [substantive] law," and a dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *see* D.N.M. LR-Civ. 56.1(b) ("[M]aterial facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.")

The movant must first demonstrate "the absence of a genuine issue of material fact and entitlement to judgment as a matter of law" prima facie. *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted). The nonmovant must do so "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein"—all of which must be admissible evidence. *Id.* at 1309; *accord* Fed. R. Civ. P. 56(c).

"A 'judge's function' in evaluating a motion for summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1280 (2017) (Sotomayor, J., dissenting from denial of cert.) (quoting *Anderson*, 477 U.S. at 249). In evaluating such a motion, the Court's discretion is limited in two respects.  First, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Second, the Court can only consider admissible evidence. *Standish v. Jackson Hole Mt. Resort Corp.*, 997 F.3d 1095, 1107 (10th Cir. 2021) (emphasis removed).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it

alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall*, 935 F.2d at 1111 (citation omitted). A *Martinez* report is also treated as an affidavit and can be used in determining whether to grant summary judgment if it is "supported by affidavits or other materials provided under oath." *Id.* at 1110–11 (citations omitted). A court cannot resolve materially disputed factual issues by accepting a *Martinez* report's findings when the plaintiff has presented conflicting evidence. *Id.* at 1111. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corrs. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006). However, a court must liberally construe the allegations contained in a *pro se* plaintiff's pleadings. *See Northington v. Jackson*, 973 F.2d 1518, 1520–21 (10th Cir. 1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)).

## B. Corrections Defendants' Exhaustion Motion

In the first of their five summary judgment motions, Corrections Defendants argue that the Court should dismiss certain of Plaintiff's claims based upon his failure to exhaust administrative remedies. *See* ECF 57. The Court examines Plaintiff's exhaustion efforts in light of NMCD grievance policies.

### 1. Exhaustion of Administrative Remedies Standard

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "seeks to afford

corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (quotation marks and brackets omitted). Thus, the PLRA requires "proper exhaustion," whereby the prisoner complies with the applicable "deadlines and other critical procedural rules," as a precondition to bringing suit in federal court. *Id.* at 90–91, 93. Moreover, an inmate must exhaust all available administrative remedies even if those remedies "appear to be futile at providing the kind of remedy sought," and if he fails to do so, his claims must be dismissed. *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002); *see also Ross v. Blake*, 578 U.S. 632, 640 (2016).

Failure to exhaust administrative remedies under the PLRA is an affirmative defense, *Jones v. Bock*, 549 U.S. 199, 216 (2007), and the defendant "bear[s] the burden of asserting and proving that the plaintiff did not utilize administrative remedies." *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011). If the defendant makes the required showing, then the burden shifts to the plaintiff "to show that remedies were unavailable to him." *Id.* "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010); *see also Ross*, 578 U.S. at 644; *McMiller v. Jones*, 590 F. App'x 749, 750–51 (10th Cir. 2014).

### 2. Grievance Procedure

The applicable NMCD grievance procedure, NMCD Policy CD-150501, sets forth the procedural steps with which an inmate must comply to exhaust a grievance.[6] ECF 37-2 at 108–15

---

[6] When, as here, the *Martinez* Report's description of the policies remains undisputed after the plaintiff's opportunity to respond, the Court treats the portion of the *Martinez* Report describing the policies or procedures like a written document that has been attached to the plaintiff's complaint. *Hall*, 935 F.2d at 1112–13.

(CD-150501). First, the inmate is required to file an informal complaint within five working days of the incident giving rise to the complaint. *Id*. at 108. In so doing, the inmate must include a detailed explanation of his complaint. *Id*. The Grievance Officer then forwards the complaint to the proper recipient whose role is to "make every effort to resolve [it] within five [5] working days from receipt" and document the response. *Id*. A copy of the written response is given to the inmate who initiated the complaint. *Id*. If the inmate is dissatisfied with that response, or if he receives no response within ten working days, he may file a formal grievance. *Id*. at 108–09. Once the Grievance Officer receives a formal grievance, she notifies the grievant of its receipt on an Inmate 5-Day Notice of Receipt of Formal Grievance form and proceeds to, among other things, screen the grievance for timeliness and necessary information, conduct an investigation, document and resolve the recommended resolution, and complete the report on the Inmate Grievance Form. *Id*. at 110–11. The Grievance Officer's report and recommendation is delivered to the Warden for review within fifteen days of its receipt. *Id*. at 111. Within fifteen days, the Warden or his designee may approve, disapprove, or modify any disposition recommended by the Grievance Officer. *Id*. The grievant will be informed in writing of the Warden's decision within five working days of approval. *Id*. at 112. If the grievant is dissatisfied with the decision of the Warden, he may appeal the decision to the Office of the Secretary of Corrections by depositing the appeal portion of the Inmate Grievance Form in the grievance mailbox within five days of receipt of that decision. *Id*. The Statewide Grievance/Disciplinary Appeals Manager will conduct any further investigation necessary and present a recommendation to the Secretary of Corrections or her designee. *Id*. The Secretary, the Director of Adult Prisons, or a designee will render a final decision on the grievance. *Id*. An inmate exhausts administrative remedies only after appeal to the Secretary. *Id*. at 108–12.

15

### 3. Analysis

#### a. *Counts VII and X*

Corrections Defendants argue that Counts VII and X[7] of Plaintiff's Complaint are "based entirely on . . . improperly exhausted grievance[s], . . . not properly before the Court, and should be dismissed." ECF 57 at 11. The Court agrees.

In Count VII, Plaintiff alleges violations of his constitutional rights due to PNM's COVID-19 policy concerning in-person visitation. ECF 1 at 29. The *Martinez* Report reveals that Plaintiff filed two grievances underlying his allegations in this count: N-21-07-09 and N-21-09-08. *See* ECFs 57 at Undisputed Material Fact ("UMF") 13; 37-3 at 169 (NMCD_001626), 171–72 (NMCD_001628-001629). In the first of these grievances, N-21-07-09, Plaintiff complained that NMCD was "trying to force or blackmail inmates into taking the corona vaccine through withholding visits, etc." *See* ECF 37-3 at 169 (NMCD_001626). In terms of relief, Plaintiff requested that NMCD "respect [his] right to refuse[the] paranoid dangerous del[]usions." *Id*. The grievance form identifies the "incident date" as June 29, 2021, but the form indicates that it was received by the Grievance Officer eight days later, on July 7, 2021. *See id*. Consequently, the grievance form was returned to Plaintiff on the basis of untimeliness. *See id*.; *see also* ECF 37-2 at 108 (CD-150501, requiring inmates to file an informal complaint within five working days of the incident giving rise to the complaint).

---

[7] There are inconsistent references in the briefing to the numbering of Plaintiff's counts. Corrections Defendants indicate that "[i]n Count *IX*, Plaintiff alleges that he was denied medical care and medication for pain and ADHD in violation of the Eighth Amendment and Americans with Disabilities Act." *See e.g.*, ECF 57 at 5 (emphasis added). However, Plaintiff's Complaint identifies this same claim as "Count X." *See* ECF 1 at 33. Count IX of Plaintiff's Complaint, in contrast, asserts a claim premised upon nonreceipt of stimulus checks from the IRS. *See* ECF 1 at 31–32. Consistent with the designation in Plaintiff's Complaint, the Court refers to Plaintiff's denial of medical care claim as Count IX.

In the second grievance, N-21-09-08, Plaintiff complained that in September 2021 PNM lacked "sufficient facilities for visitation and [that] visitation was being denied due to vaccination." ECF 37-3 at 171 (NMCD_001628).  In terms of relief, Plaintiff sought "more monitors for video visits" and noted that "visits are behind glass." *Id*. Critically, the grievance form indicates that Plaintiff did not pursue a departmental appeal after his grievance was resolved by the Warden or his designee. *See* ECF 37-3 at 172 (NMCD_001629).

Corrections Defendants argue, and the Court agrees, that there is no genuine dispute of material fact as to Plaintiff's failure to exhaust N-21-07-09 or N-21-09-08. In his consolidated response brief, Plaintiff maintains, in conclusory fashion, that he "exhausted every claim and or did all that he could to do by what was 'available'" ECF 81 at 1. He insists that he "always first filed informal, for every issue, and always appealed. Logs and exhibits show that."[8] *Id*. at 1–2. Plaintiff's bald allegations suggesting that he *always* followed the grievance process through appeal fail to create a genuine dispute of material fact as to exhaustion of N-21-07-09 or N-21-09-08. Moreover, Plaintiff does not point to any specific evidence in the record contradicting what

---

[8] Plaintiff makes reference to "logs and exhibits" that he purports demonstrate exhaustion of all of his grievances. ECF 81 at 1–2. It appears that Plaintiff may be referring to a handwritten "Grievance Log" that he submitted in conjunction with his *Martinez* Report. *See* ECF 51-1. That log, like many documents contained in Plaintiff's *Martinez* Report, is subject to Corrections Defendants' Motion to Strike Plaintiff's Exhibits. ECF 62 at 8. Corrections Defendants insist that Plaintiff's notes constitute "inadmissible hearsay because [they] comprise Plaintiff's out-of-court statements offered for the truth of the matters asserted." ECF 62 at 8 (citing *Payan v. United Parcel Servs.*, 905 F.3d 1162, 1171 (10th Cir. 2018)). Corrections Defendants observe that Plaintiff's notes do not substitute for his testimony on summary judgment because he has not incorporated the allegations into a sworn affidavit or otherwise attested to their accuracy. ECF 62 at 9 (citing *Lincoln v. BNSF Ry. Co.*, No. 15-4936-DDC-ADM, 2020 WL 4000912, at *15 (D. Kan. July 15, 2020)). To the extent Defendants suggest that Plaintiff's grievance log is not, in its present form, competent summary judgment evidence, the Court agrees. Although Plaintiff submits a similar October 8, 2021 grievance log that is "sworn . . . under penalty of perjury," that log appears to relate to grievance-related actions in a different period (*i.e.*, July 2020 to January 2021). *See* ECF 51-1 at 1–4. In contrast, the separate grievance log that relates to the relevant period here (*i.e.*, from May 2020 to March 2022) is *not* sworn or submitted under penalty of perjury. *See* ECF 51-1 at 5–10. Moreover, Plaintiff does not articulate how entries in that unsworn grievance log specifically contradict Corrections Defendants' material facts related to his failure to exhaust N-21-07-09 or N-21-09-08, and it is not clear to the Court that they do. *See generally*, ECFs 51; 51-1.

Corrections Defendants assert and what the Court's inspection of N-21-07-09 and N-21-09-08 reveals: that Plaintiff failed to exhaust these grievances. Nor does Plaintiff identify a different but exhausted grievance that relates to Count VII. *See generally* ECFs 51, 81.

Even so, the Court is cognizant of its duty to consider any evidence presented by Plaintiff that might suggest administrative remedies were "unavailable" to him. *See Ross*, 578 U.S. at 642– 44. Indeed, the Supreme Court has articulated three situations when administrative remedies might be considered "unavailable" such that an inmate's failure to exhaust is excused: (1) when "an administrative procedure . . .  operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates[;]" (2) when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use[;]" and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

For his part, Plaintiff makes the vague assertion in his sworn Complaint that Corrections Defendants "frustrated and impeded claims as [they] interfere[d], intentionally, with the grievance process, again systematically." ECF 1 at 15. Without any specifics, Plaintiff alleges that Corrections Defendants "refused to provide copies, call grievances 'resolved,' lose them, or refuse to process them, intentionally trying to thrwart exhuastion to prevent successful litigation. Dozens of grievances disappeared." *Id*. Athough Plaintiff appears to invoke *Ross's* third variety of "unavailability," his conclusory allegations, on their own, lack the specific supporting facts to warrant probative value or to create a genuine issue of fact. *See Fitzgerald*, 403 F.3d at 1143.

In his unsworn consolidated response brief, Plaintiff suggests that it "should be readily apparent from the actual documents provided" that he was "frustrate[d] and impeded from exhaustion." ECF 81 at 2. In support, he "directs [the] Court to Doc. 51, Exhibits pg. 11 of 20

(Antonetti's listed pg. 26)."[9] *Id*. That document, submitted in conjunction with Plaintiff's *Martinez* Report, is formal grievance N-20-12-19, which contains within it the handwritten allegation that Plaintiff's "unit manager did not return informals signed 11/30/20." ECF 51-2 at 11. Even if the Court were to consider the handwritten statement contained therein for the truth of the matter asserted, the grievance hardly constitutes evidence that prison staff in fact interfered with Plaintiff's ability to use the grievance process. After all, that very same grievance record includes a notice from Director Maciel that N-20-12-19 was "resolved" on appeal and that Plaintiff's administrative remedies were therefore "exhausted." *See id*. at 12. Thus, rather than supporting Plaintiff's position that prison staff thwarted his effective use of the grievance process, the grievance record upon which he relies supports the opposite inference: that his ability to take advantage of the grievance process and to exhaust his administrative remedies was plainly not intereferred with.[10]

---

[9] The only objection to this exhibit articulated in Corrections Defendants' Motion to Strike is that it is "cumulative" of documents contained within Defendants' *Martinez* Report. *See* ECF 62 at 17–18. To the extent Corrections Defendants seek to strike this exhibit, their Motion to Strike should be denied.

[10] Beyond his citation to grievance N-20-12-19, Plaintiff also references the following: "pg. 17, pg. 20, pg. 7 of 10, pg. 5 of 12, pg. 2 of 25, pg. 16 of 25, pg. 18 of 25, pg. 2 of 35, pg. 12 of 35, [and] pg. 15 of 35." ECF 81 at 2. As best the Court can surmise, these citations refer to other grievances in which Plaintiff made similar complaints that the unit manager had not returned informal complaints. *See, e.g*., ECFs 51-4 at 7 (of 10) (N-20-12-20); 51-5 at 5 (of 12) (N-20-12-18); 51-6 at 2 (of 25) (N-21-02-07); 51-6 at 16 (of 25) (N-21-08-05); 51-6 at 18 (of 25) (S-22-08-14); 51-7 at 2 (of 35) (N-21-10-01); 51-7 at 12 (of 35) (S-22-13-06); 51-7 at 15 (of 35) (N-21-02-09). However, the failure to return an informal complaint, by policy, does not curtail an inmate's ability to exhaust his grievance. Rather, it triggers the next step of the grievance process, permitting the inmate to proceed to a formal grievance. *See* ECF 37-1 at 108–09 (providing that in the event that an inmate fails to receive a response to his informal complaint within ten days, he may file a formal grievance). Filing a formal grievance is precisely the action that Plaintiff took here, even as he complained about not receiving "informals" from unit managers.

It could also be that Plaintiff meant to complain not that he failed to receive a response to his informal complaints but that he did not receive a *copy* of his informal grievances as required by NMCD policy. However, even if Plaintiff was not given copies of his informal grievances, there is no indication that such noncompliance with grievance procedure actually intereferred with Plaintiff's exhaustion of administrative remedies. The evidence is to the contrary.

As such, Corrections Defendants are entitled to summary judgment on Count VII based upon Plaintiff's failure to exhaust. *See Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a [federal] claim under the PLRA for failure to exhaust his administrative remedies."). The Court recommends that Count VII be dismissed without prejudice for failure to exhaust.

In Count X, Plaintiff alleges a denial of medical care and medication for chronic pain and ADHD in violation of the Eighth Amendment and the Americans with Disabilities Act ("ADA"). ECF 1 at 33. Plaintiff filed a singular grievance related to this claim: N-21-04-05. *See* ECFs 57 at UMF 15; 37 at 90; 37-3 at 173–75 (NMCD_001630-001632). In that March 16, 2021 grievance, Plaintiff complained that "NMCD seems to have issues at all its institutions with providing pain medications even for legitimate issues [and that] NMCD . . . refuses meds that work . . . leaving us in pain . . . ." ECF 37-3 at 173 (NMCD_001630). For relief, Plaintiff sought "chronic care pain meds." *Id*. The grievance form indicates that Plaintiff did not proceed to a departmental appeal after the grievance was resolved by the Warden or his designee. *See* ECFs 37-3 at 174 (NMCD_001631); 57 at UMF 15. And Plaintiff does not point to any evidence to the contrary.

Once again, Corrections Defendants argue, and the Court agrees, that there is no genuine dispute of material fact as to Plaintiff's failure to exhaust N-21-04-05. As with the grievances underlying Count VII, Plaintiff does not in his consolidated response brief or otherwise point to any admissible record evidence indicating that N-21-04-05 was in fact exhausted.[11] *See generally*

---

[11] Once again, the Court observes that the handwritten "grievance log" that appears to correspond with the relevant period (*i.e.*, from May 2020 to March 2022) is *not* sworn or submitted under penalty of perjury. *See* ECF 51-1 at 5–10. Moreover, Plaintiff does not articulate how entries in that grievance log contradict Defendants' material facts

ECFs 51; 81. Nor does Plaintiff identify a different but exhausted grievance relating to Count X. *See generally* ECFs 51; 81. As such, Corrections Defendants are also entitled to summary judgment on Count X based upon Plaintiff's failure to exhaust. *See Fields*, 511 F.3d at 1112. The Court therefore recommends that Count X be dismissed without prejudice.

### b. *Grievances Supporting Counts IV and V*

Next, Corrections Defendants contend that "Counts IV and V arise *partly* out of grievances that Plaintiff failed to exhaust." ECF 85 at 6 (emphasis added). Corrections Defendants take the position that "[b]ecause Plaintiff has failed to meet his Rule 56 burden as to exhaustion of [certain enumerated] grievances, any allegations or claims on which [those grievances] are based are subject to dismissal on summary judgment." *Id*. At the same time, Corrections Defendants concede that there are *some* grievances underlying Counts IV and V that *were* properly exhausted. *Id*.

With respect to Count IV, in which Plaintiff alleges violations of his First and Fourteenth Amendment rights based upon interference with access to the courts and denial of access to a law library, Corrections Defendants concede that "Plaintiff has produced record evidence that he exhausted his remedies under N-21-02-07, rendering summary judgment improper as to that grievance."[12] ECF 85 at 6 (citing Plaintiff's Undisputed Material Fact ("PUMF") at 16). Further, with respect to Count V, in which Plaintiff alleges violations of his First and Fourteenth Amendment rights for denial of mail, magazines, and hardcover books, Defendants concede that

---

concerning his failure to exhaust N-21-04-05, and it is not clear to the Court that they do. *See generally*, ECFs 51; 51-1.

[12] In grievance N-21-02-07, Plaintiff complains that the "law library has no case law, books for research, help, supplies like pen & paper." ECF 51-6. He requests that the law library be required to provide such supplies and to provide "help with filling out forms." *Id*. at 2.

"three [grievances] were properly exhausted under NMCD policy": N-21-02-09,[13] N-21-10-01,[14] and S-22-07-07.[15] ECF 57 at UMF 8–9 (citing ECF 37-3 at 37–38 (NMCD_001494–001495), 46–47 (NMCD_001503-001504), 59–62 (NMCD_001516-001519)). Corrections Defendants also "accept as true for purposes of [their Exhaustion Motion] that Plaintiff procedurally exhausted S-22-04-10,"[16] which also relates to Count V. ECF 85 at 7 (citing PUMF at 17); *see also* ECF 51-7 at 18.

On the other hand, Corrections Defendants insist that Plaintiff *failed* to exhaust one grievance related to Count IV (*i.e.*, S-22-11-08) and eight grievances related to Count V (*i.e.*, N-21-04-04; N-21-07-08; S-22-03-03; S-22-03-06; S-22-07-08; S-22-08-03; S-22-08-14; S-22-11-18). ECF 85 at 6–7 (citing ECF 57 at UMFs 6, 8–9).

Moreover, Corrections Defendants argue that certain "grievances are insufficient as a matter of law because Plaintiff did not provide enough information to prison officials to address the substance of [his] complaints." ECF 57 at 12. Specifically, they identify two grievances underlying Count V that, in their assessment, are insufficient as a matter of law: N-21-10-01, which Defendants identified as "properly exhausted under NMCD policy" [ECF 85 at 6], and S-22-04-

---

[13] In N-21-02-09, Plaintiff grieved the "practice of denying inmates hardcover books, photos and magazines with bikini clad, etc. females/males." ECF 37-3 at 37. Plaintiff asserts that "all the pics of my wife were taken and we can't get certain magazines for no good reason." *Id.* Plaintiff sought relief in the form of access to hardcover books and "books coming from legitimate vendors," as well as "bikini pics/mags." *Id.*

[14] In N-21-10-01, Plaintiff grieved his "mail . . . not arriving for 20–30 days if at all." ECF 37-3 at 46. He complained that his mail is "constantly denied" without notice. *Id.* In terms of relief, Plaintiff sought receipt of mail within 48 hours or, if held, within 72 hours as well as an opportunity to challenge refusals. *Id.*

[15] In S-22-07-07, Plaintiff grieved that "PNM-NMCD has decided to photocopy confidential legal mail on arrival" and demanded cessation of photocopying. ECF 37-3 at 59.

[16] In S-22-04-10, Plaintiff grieved the "Mailroom . . . not following . . . policy [by giving] no notice of mail confiscation/rejections for opportunity to challenge in grievances." ECF 51-7 at 19. Plaintiff sought "all of [his] pictures & letters, change of policy and proper training of staff, enforcement of . . . policies." ECF 51-7 at 19.

10, which Defendants "accepted" as procedurally exhausted for purposes of their Exhaustion Motion [*id*. at 7].

First, as to N-21-10-01, Corrections Defendants contend that Plaintiff failed to provide any dates to support his claim that his mail was withheld for thirty days. ECF 57 at 13 (citing ECF 37-3 at 47–48 (NMCD_001504)). Corrections Defendants highlight Director Gary Maciel's notations on the appeal portion of the grievance form, in which Director Maciel emphasized that Plaintiff had not provided rejection letters as proof of a mail delay. *Id*.; *see also* ECF 37-3 at 48 ("Mailroom would need to know dates of inmate rejection letters to determine a timeline[, but] no rejection letters were provided with grievance as proof."). In his response to Plaintiff's appeal, Director Maciel determined that Plaintiff "exhausted [his] administrative remedies" as to N-21-10-01 but noted that the grievance appeal was "considered resolved" because Plaintiff "failed to provide any additional evidence to support his claim." ECF 37-3.

Defendants advance similar arguments with respect to S-22-04-10, maintaining that the grievance was denied "because Plaintiff did not provide any proof that his rejection was received months later." ECF 57 at 13 (citing ECF 37-3 at 55 (NMCD_001512)). In S-22-04-10, Plaintiff complained that he received notice "2 months later" that mail was rejected by the mailroom without any opportunity for him to contest the rejection.[17] *See* ECF 37-3 at 56. In his May 13, 2022 letter to Plaintiff concerning his appeal of this grievance, however, Director Maciel observed that

---

[17] Corrections Defendants cite an apparently related "Publication Review Panel Determination" dated February 22, 2022, which indicates that mail from Arian Vigil to Joseph Antonetti was rejected by NMCD on the basis that it contained "one sexually explicit letter/2 photos with inmate." *See* ECF 57 at 13 (citing ECF 37-3 at 57 (NMCD-00154)). A handwritten notation at the top of the February 22, 2022 Determination reads: "Received 4-6-22 J.A." If the Court were to consider this handwritten notation for the truth of the matter asserted, it might constitute evidence that Plaintiff received the Determination notice one and a half months after it was issued. *See* ECF 37-3 at 5. The Court is not convinced, however, that this notation is suitable for consideration on summary judgment. *See Payan*, 905 F.3d at 1171. Ultimately, because neither party addresses the matter or relies on the handwritten notation, the Court declines to consider it for purposes of Corrections Defendants' Exhaustion Motion.

"[n]o witness name was provided to verify when the notice was given to you." ECFs 57 at 14; 51-7 at 18. Director Maciel concluded that Plaintiff's grievance appeal concerning the untimely receipt of a mail rejection notice "failed to provide any additional evidence to support [his] claim" and was therefore "considered resolved." ECF 51-7 at 18. Director Maciel went on to advise Plaintiff that he had "exhausted [his] administrative remedies" with respect to that grievance. *Id*.

Corrections Defendants insist that because Plaintiff "filed vague grievances, mechanically went through the stages of administrative review, and now introduces new evidence that he did not provide in the record below,"[18] his grievance attempts should be deemed legally insufficient. ECF 57 at 14. Insisting that such "gamesmanship is fundamentally unfair and deprives [them] of fair notice of the issues in controversy," Corrections Defendants maintain that Plaintiff should be prohibited from prosecuting claims underlying N-21-10-01 and S-22-04-10, among other grievances.[19]

In support, Corrections Defendants rely primarily upon *Dawson v. Archambeau*, No. 21-1307, 2022 WL 16748511, at *4 (10th Cir. Nov. 7, 2022) and *Kikumura v. Osagie*, 461 F.3d 1269 (10th Cir. 2006), *overruled on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *as explained in Robbins v. Oklahoma*, 519 F.3d 1242, 1246–47 (10th Cir. 2008). In these

---

[18] For instance, Corrections Defendants point to exhibits submitted in conjunction with Plaintiff's *Martinez* Report, including: (1) a Securus Digital Mail Center Export report, which indicates that correspondence received from "[Y]vonne [M]eehan" was received on "2022-08-04," but according to a handwritten notation by an unidentified author was "given 11-10-22" [ECF 51-7 at 25]; (2) an envelope addressed to Plaintiff from "Arian Antonetti" with a postmark of "16 Sep 2021" and a handwritten notation by an unidentified author indicating that it was "received 12-16-21" [*id*. at 26]; and (3) an envelope addressed to Plaintiff from Judge Matthew J. Wilson with a postmark of June 2023, and a handwritten notation by an unidentified author indicating that it was "Received 7-12-23" [*id*. at 27]. The Court need not consider these exhibits to resolve Corrections Defendants' Exhaustion Motion.

[19] For these same reasons, Defendants contend that Plaintiff should be precluded from prosecuting claims underlying N-21-09-03, which relates to Count I, and N-20-12-18, which relates to Count III. *See* ECF 57 at 14. Defendants, however, do not ask the Court to dismiss Counts I or Count III in their entirety on the basis of failure to exhaust, nor do they adequately develop their position with respect to which portions of those claims Plaintiff should be precluded from prosecuting. As such, the Court recommends Corrections Defendants' Exhaustion Motion be denied on these grounds.

24

cases, the Tenth Circuit reasoned that a grievance satisfies the PLRA's exhaustion requirement if it is not so vague as to prevent prison officials from investigating and internally addressing the inmates' complaints. *See Dawson*, 2022 WL 16748511 at *4; *Kikumura*, 461 F.3d at 1285. First, in *Kikumura*, the Tenth Circuit held that an inmate's grievance sufficed for exhaustion purposes even though it failed to name two wrongdoers later named as defendants in the prisoner's civil rights case. 461 F.3d at 1285. In *Dawson*, the court observed that the grievant failed to provide "information about what [the defendant] had allegedly done wrong." 2022 WL 16748511 at *4. The court emphasized that the grievances there were not filed during the relevant time period, did not bear upon the grievant's legal claims, and failed to mention any conduct or lack of conduct by the defendant. *Id*. But, here, the Court is not convinced that grievances N-21-10-01 and S-22-04-10 suffer from the same level of vagueness.

In N-21-10-01, Plaintiff attempted to alert NMCD that his mail was delayed, often by 20-30 days, without notice. ECF 37-3 at 46. And in terms of relief, Plaintiff sought receipt of mail within 48 hours or, if held, within 72 hours. *Id*. In addition, Plaintiff sought an opportunity to challenge refusals. *Id*. In S-22-04-10, Plaintiff again complained about not receiving mail. ECF 51-7 at 19. He alleged that the PNM Mailroom was confiscating his mail without notice and that he was not afforded an opportunity to challenge the confiscations or rejections. *Id*. Plaintiff sought "all of [his] pictures & letters, change of policy and proper training of staff, enforcement of . . . policies." *Id*. Although Plaintiff certainly could have provided more helpful details, including the dates on which particular pieces of mail were purportedly rejected, the Court is not convinced that he failed to adequately describe, for purposes of exhaustion, the circumstances surrounding his complaints or the relief he sought. And neither *Dawson* nor *Kikumura* lead the Court to such a conclusion.

Moreover, Corrections Defendants admit that Plaintiff exhausted *some* grievances underlying Counts IV and V, and therefore seek dismissal of those counts *only* "to the extent [they] cannot be supported by exhausted grievances." ECF 85 at 6–7. Yet, Corrections Defendants do not articulate precisely which portions of Counts IV or V remain unexhausted. *See generally* ECFs 57; 85. In the Court's view, the grievances that Corrections Defendants identify as exhausted but legally insufficient are aligned with the allegations in Counts IV and V, and the Court cannot perceive significant allegations in these counts that remain unsupported by exhausted grievances. Because Defendants have not met their burden to establish Plaintiff's failure to exhaust specific portions of Counts IV or V, the undersigned therefore recommends that the Court deny Corrections Defendants' Exhaustion Motion as to those counts and proceed to consideration of the merits of Counts IV and V. Further, insofar as Defendants seek dismissal of portions of Counts I or III for failure to exhaust [*see* ECF 57 at 14], the Court likewise concludes that Defendants have not met their burden to establish a failure to exhaust and recommends that their Exhaustion Motion be denied as to those claims as well.

In sum, Corrections Defendants have met their burden to establish that Counts VII and X were not properly exhausted and must therefore be dismissed without prejudice. Conversely, Corrections Defendants have failed to demonstrate a failure to exhaust with respect to the balance of the counts in Plaintiff's Complaint.

## C. Corrections Defendants' Qualified Immunity Motion

Having determined that Plaintiff's claims in Counts I-VI are not subject to dismissal for want of exhaustion, the Court turns to the substance of those claims, which Corrections Defendants challenge both on the ground of qualified immunity and by separate summary judgment motions. Although not addressed by the parties in their briefs, the Court pauses to consider the scope of

relief available to Plaintiff under 42 U.S.C. § 1983, pursuant to which he brings his claims.[20] Notably, Plaintiff does not specify whether he is suing Corrections Defendants in their individual capacities, their official capacities, or both. *See* ECF 1. But he does seek both money damages and injunctive relief, which suggests he may be pursuing claims against Corrections Defendants in both capacities. *See id.* at 34; *see also Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief."). To the extent Plaintiff attempts to bring claims against Corrections Defendants, who are state employees, in their official capacities for money damages, those claims are barred by the Eleventh Amendment. *See Bishop v. John Doe 1*, 902 F.2d 809, 810 (10th Cir. 1990) (citing *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 684 (1982)). Under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), however, Eleventh Amendment immunity generally does not extend to a state official sued in his official capacity if the plaintiff seeks prospective, injunctive relief against that state official. *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007). In other words, if "the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," the law permits an official-capacity suit. *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Here, Plaintiff does not specify the injunctive relief he seeks, though he argues that various violations were "ongoing" at the filing of his Complaint. *See generally* ECF 1. But critically, Plaintiff is no longer housed at PNM or in PBMP, where the alleged constitutional violations

---

[20] Although Plaintiff's Complaint makes reference to "supplemental jurisdiction" over state law claims, the Court does not read the Complaint to assert any state law causes of action against Corrections Defendants. Instead, Plaintiff asserts federal constitutional violations and violations of federal statutes, including the ADA and RLUIPA. *See* ECF 1. At most, Plaintiff indicates, in the context of his discussion of Count I, that he "*believes* the state laws and New Mexico Constitution [also] require outside exercise." *Id*. at 5. Even construing Plaintiff's Complaint broadly, expressing his *belief* as to what is required under state law is not the same as asserting a claim thereunder.

occurred. *See* ECF 24. And he may not maintain injunctive relief claims premised on conditions of confinement at a facility where he is no longer housed. *See Green v. Branson,* 108 F.3d 1296, 1300 (10th Cir. 1997); *White v. Colo.,* 82 F.3d 364, 366 (10th Cir. 1996). Indeed, when a prisoner is released or transferred to a different facility, his prospective injunctive relief claims premised on conditions of confinement at that former facility are rendered moot. *See Urioste v. Corizon & Centurion Health Care Providers*, No. CV 16-00755 JCH/KRS, 2020 WL 94860, at *4 (D.N.M. Jan. 8, 2020) (reasoning that because the plaintiff had been transferred and was no longer housed at PNM, he was no longer subject to the conditions he alleged as a basis for his injunctive relief claim, and his claims were therefore moot and subject to dismissal) (citation omitted). For all of these reasons, the Court recommends that any official-capacity injunctive relief claims Plaintiff asserts in his Complaint, including those asserted under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"),[21] be dismissed as moot.

Plaintiff's damages claims against Corrections Defendants in their individual capacities are another matter, as Plaintiff's transfer to a different facility has no effect on those claims. *See Green,* 108 F.3d at 1300; *Urioste*, 2020 WL 94860, at *4. Nor does the Eleventh Amendment bar actions for damages against state officials in their individual capacities. *See Kentucky v. Graham,* 473 U.S. 159, 166–67 (1985). Thus, in resolving the pending summary judgment motions, the scope of the

---

[21] The only relief offered by RLUIPA is declaratory and injunctive relief against Corrections Defendants in their official capacities, as there is no cause of action under RLUIPA for individual-capacity claims. *See Warner v. Patterson*, 534 F. App'x 785, 788 (10th Cir. 2013). Just as Plaintiff's constitutional claims seeking injunctive relief are rendered moot by his transfer away from PNM, so too are his claims under RLUIPA. *See id.* (finding as moot the plaintiff's claims under RLUIPA given that the plaintiff was no longer in the custody of the Utah Department of Corrections) (citations omitted)). *But see Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010) (holding that because the plaintiff remained incarcerated in an Oklahoma Department of Corrections ("ODOC") facility, subject to ODOC policies, and because the director of ODOC remained a party to the litigation, the plaintiff's RLUIPA claims were not moot). Here, Plaintiff's RLUIPA claims are aimed at religious deprivations he claims to have experienced in a particular NMCD program (*i.e.*, PBMP) within PNM.  As such, the Court finds these claims mooted by his successful completion of and release from that program.

Court's inquiry is narrowed to whether Corrections Defendants are entitled to summary judgment as to damages claims against them in their individual capacities for alleged violations of Plaintiff's First, Eighth, and Fourteenth Amendment rights,[22] as well as his rights under the ADA, premised on his placement and confinement in PBMP at PNM. *See* ECFs 1, 7.

### 1. Qualified Immunity Standard

The defense of qualified immunity shields officials from civil liability as long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Qualified immunity also shields officials who have "reasonable, but mistaken beliefs" and operates to protect officials from the law's sometimes "hazy border[s]." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). In sum, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *D.C. v. Wesby,* 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Because of the burdens of litigation, issues of qualified immunity are best resolved at the "earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis v. Tripp*, 604 F.3d 1221, 1230 (10th Cir. 2010). "Once a defendant raises qualified immunity, the plaintiff bears the burden to show that the defendant is

---

[22] While Plaintiff also attempts to assert claims for Fifth Amendment violations on various bases, the Fifth Amendment acts as a limit on only *federal* governmental action, and Corrections Defendants are not federal actors. As such, Plaintiff fails to state a claim on which relief can be granted under the Fifth Amendment. *See Pub. Utilities Comm'n v. Pollak,* 343 U.S. 451, 461 (1952) (Fifth Amendment applies to and restricts only the federal government); *Riley v. Camp,* 130 F.3d 958, 972 n.19 (11th Cir.1997) (Fifth Amendment's due process clause applies only to acts of the federal government and does not limit actions of state officials). Because Plaintiff cannot establish violations under the Fifth Amendment, the Court has omitted reference to any alleged violations of that Amendment herein.

not entitled to immunity." *Lincoln*, 880 F.3d at 537 (citing *Douglas v. Dobbs*, 419 F.3d 1097, 1100 (10th Cir. 2005)). To overcome the defense of qualified immunity, a plaintiff must show that the defendant violated a constitutional or statutory right and that the violated right was clearly established at the time of the alleged unlawful activity. *Lincoln*, 880 F.3d at 537 (internal quotations omitted) (citing *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016)). For the law to be clearly established:

> [t]he contours of the constitutional right at issue must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. And the contours of a particular right are generally only sufficiently clear to put a reasonable official on notice if a plaintiff (1) identif[ies] an on-point Supreme Court or published Tenth Circuit decision, or (2) shows the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.

*Perry v. Durborow*, 892 F.3d 1116, 1122–23 (10th Cir. 2018) (quotations and citations omitted).

"A right is 'clearly established' when every "'reasonable official would [understand] that what he is doing violates that right.'" *Lincoln*, 880 F.3d at 537 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In other words, a court may conclude that a right was clearly established only if it "was sufficiently clear that a reasonable government officer *in the defendant's* shoes would understand that what he or she did violated that right." *Casey v. W. Las Vegas Independent Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007) (emphasis added). But courts cannot define the relevant constitutional right "at a high level of generality[;]" rather, the analysis must determine whether the "clearly established law . . . [is] particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotations omitted). Although, this inquiry "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Mullenix*, 577 U.S. at 11) (internal quotations omitted). "[T]he key is whether the *specific conduct* has been clearly established as a

constitutional violation." *Lincoln*, 880 F.3d at 537 (quoting *Mullenix*, 577 U.S. at 11) (emphasis added).

### 2. Undisputed Material Facts[23]

Plaintiff was incarcerated at Lea County Correctional Facility ("LCCF") in July 2020, when he assaulted another inmate with a deadly weapon. ECFs 61 at UMF 6; 37-1 at 34 (NMCD_001141).[24] As a result of that incident, Plaintiff was placed in Temporary Restrictive Housing ("TRH") on July 18, 2020, pending investigation. ECFs 61 at UMF 8; 37-1 at 34 (NMCD_001141). Following LCCF's investigation, Plaintiff was the subject of a disciplinary misconduct report for his role in the incident. ECFs 61 at UMF 9; 37-1 at 34 (NMCD_001141). On August 31, 2020, a disciplinary hearing was held at LCCF, and Plaintiff was found guilty of an "A(6)" offense. ECFs 61 at UMF 10; 37-1 at 34 (NMCD_ 001141). The disciplinary officer recommended, and the Deputy Warden/Designee approved, restrictions to Plaintiff's privileges— including commissary, phone, and visitation—for 365 days. ECFs 61 at UMF 10; 37-1 at 34 (NMCD_ 001141). After receiving notice of that decision, Plaintiff filed a disciplinary appeal. ECFs 61 at UMF 10; 37-1 at 34 (NMCD_001141). Warden Dwayne Santistevan upheld the report and sanctions, however. ECFs 61 at UMF 10; 37-1 at 34–35 (NMCD_001141–42). Plaintiff was in custody at LCCF throughout the disciplinary and appeal process. ECF 61 at UMF 11; 37-1 at 35 (NMCD_1142).

---

[23] The facts that follow are derived from Plaintiff's Complaint [ECF 1], Corrections Defendants' Qualified Immunity Motion [ECF 61], Corrections Defendants' *Martinez* Report[23] [*see* ECF 37–39], and from the full record before this Court. The facts set forth in this section are not "specifically controverted" with competent evidence by the non-moving party. *See* D.N.M. LR-Civ. 56.1.

[24] The Court's citations correspond with the document numbers and pagination generated by CM/ECF. For clarity, the Court has also included, in citation parentheticals, the Bates numbering found on documents submitted in conjunction with Corrections Defendants' *Martinez* Report.

On October 26, 2020, Plaintiff was referred to PBMP at PNM, as a mandatory referral for the offense of assault with a deadly weapon on an inmate. ECFs 61 at UMF 12; 37-1 at 35 (NMCD_001142). In connection with that referral, Plaintiff was served with a Notice of Contemplated Action on October 28, 2020, with a hearing set for two days later. ECFs 61 at UMF 12; 37-1 at 35 (NMCD_001142). On November 4, 2020, Plaintiff was transferred from LCCF to PNM pending acceptance into PBMP, which was approved the next day. ECFs 61 at UMFs 13–14; 37-1 at 35 (NMCD_001142). Plaintiff was placed into PBMP on November 23, 2020, where he remained for one year, until November 24, 2021. ECFs 61 at UMFs 14–15; 37-1 at 35 (NMCD_001142).

Plaintiff insists that, while in PBMP at PNM,[25] he was subject to myriad constitutional violations. *See* ECF 1. First, he alleges that his placement in PBMP itself violated his Eighth and Fourteenth Amendment rights. *Id*. at 7–11 (Count II). Second, according to Plaintiff, he was denied outside recreation for 39 days while in PBMP in violation of his Eighth and Fourteenth Amendment rights.[26] *Id*. at 4–6 (Count I). Third, Plaintiff, who is a practitioner of the

---

[25] At times Plaintiff's allegations appear to relate to time he spent at LCCF. *See, e.g.*, ECF 1 at 5 (Plaintiff's claim that his constitutional rights were violated when he was placed in TRH at LCCF). Yet, Plaintiff does not assert any claims against LCCF or its personnel in his Complaint. *See* ECFs 1; 61 at UMF 17. He also fails to state a claim that Corrections "Defendants should be liable for his treatment at the hands of non-Defendants." *See Gee v. Pacheco*, 627 F.3d 1178, 1190 (10th Cir. 2010) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) for the proposition that "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation"). In statement of fact 17 in their Qualified Immunity Motion, Corrections Defendants assert that "Plaintiff does not name any LCCF staff or personnel in this lawsuit." ECF 61 at UMF 17. Plaintiff's response suggests that he misunderstands the statement of fact. He argues that "Defendants claim Plaintiff 'does not name anyone in this lawsuit.' . . . This is another bald faced lie . . . . [Plaintiff] names: Defendants Gov. Lujan-Grisham, John Gay, Alisha Lucero, Leon Martinez, David Gonzalez, Robert Sanchez, Janine Rodriguez, Gary Maciel, Lovato and John Does 1-15. Looks like names in this lawsuit to me." ECF 81 at 11–12. But as Correction Defendants observe, the named defendants listed by Plaintiff are *not* LCCF staff or personnel. ECF 88 at 4 (citing ECF 81 at 11); *see also* ECF 37 at 11–12.

[26] Plaintiff alleges in his Complaint that, before being transferred to PNM, he was denied outdoor recreation for "about 10–11 months at LCCF." ECF 1 at 5. Given that he does not state any claims against LCCF Defendants in this case, this allegation is not material to whether Corrections Defendants are entitled to qualified immunity on Count I. In addition, Plaintiff asserts in his Complaint that he was denied outdoor recreation "'sporadically' due to staff prerogative," and in his consolidated response brief, he alleges that he was denied "regular outdoor rec for the last

Asatru/Odinist/Israelite religion, claims that Corrections Defendants violated his rights under the First Amendment by denying him access to religious land, books, icons, literature, the ability to congregate, rituals, and practices from July 18, 2020, to the time he filed his Complaint. ECF 1 at 12–13 (Count III). While inmates in PBMP are free to practice their religion in their cells, for security reasons they cannot meet in groups, and there is no space for them to congregate outdoors. ECF 37-1 at 22 (NMCD_001129).

Fourth, Plaintiff claims that Corrections Defendants interfered with both his access to courts and his access to an adequate law library and that, as a result of such interference, he was prevented from filing tort and civil rights complaints. ECF 1 at 14–16 (Count IV). In the instant case, Plaintiff alleges that he was denied access to law, case citations, books, papers, pens, envelopes, and assistance in filing under state law. *Id*. at 14.

Fifth, Plaintiff alleges that he was denied access to mail, magazines, and hardcover books in violation of his First and Fourteenth Amendment rights. *Id*. at 17–24 (Count V). In this regard, he challenges NMCD's policy of restricting hardcover books as well as its policy of restricting publications and mail based on sexual content. *See id*. at 17–22. Plaintiff also alleges that, in 2021, his personal and legal mail was delayed [*id*. at 23]; however, Corrections Defendants' *Martinez* Report uncovered no evidence that PNM personnel interfered with Plaintiff's mail or legal efforts. ECFs 61 at UMF 20; 37 at 50–52; 37-1 at 29–32 (NMCD_001136-39), 38–43 (NMCD_001145–50).

Sixth, Plaintiff alleges that his Eighth Amendment rights were violated from November 20, 2020, to the filing of his Complaint by PNM's failure to provide adequate cleaning supplies,

---

3+." But these allegations are conclusory and lack specific supporting facts to create a genuine issue of fact. *See Fitzgerald*, 403 F.3d at 1143.

toilet paper, ventilation, or plumbing. ECF 1 at 25–28. (Count VI). With respect to cleaning supplies, Plaintiff complains that he was denied "brooms, mops, toilette brushes, rags, [and] paper towels" to clean his cell. *Id*. at 25. Pursuant to NMCD policy, though, inmates are not supplied with objects that may reasonably be used as weapons, such as brooms, mops, and toilet brushes.[27] ECFs 61 at UMF 28; 37 at 86; 37-1 at 24–28 (NMCD_1131-35). At the onset of the COVID-19 pandemic, inmates at PNM were provided green pads and germicide to clean their cells in order to increase the level of sanitation. ECF 61 at UMF 29; 37 at 86; 37-1 at 24–28 (NMCD_1131–35); *see also* ECF 1 at 25 (Plaintiff asserting that he was "rarely [given] some unknown liquid" for cleaning).[28] With respect to toilet paper, Plaintiff alleges that "[a]t every prison in New Mexico, [he] was not given sufficient toilette paper," resulting in wounds to his body. ECF 1 at 25. Janine Rodriguez, the Statewide Grievance and Disciplinary Appeals Manager, attests that inmates receive one roll of toilet paper per week, plus an additional roll upon request, and that they are also permitted to purchase additional toilet paper through the commissary.[29] ECFs 61 at UMF 30; 37 at 86; 37-1 at 26–27 (NMCD_001133–34).

---

[27] Plaintiff cites no evidence to contradict this statement of fact by Corrections Defendants but instead insists that "Defendants call 'everything' a 'security threat.'" ECF 81 at 4. Plaintiff's conclusory allegation does not create a genuine dispute as to this statement of fact.

[28] Plaintiff does not point to any evidence to contradict Corrections Defendants' statement of fact concerning the provision of cleaning supplies. Instead, he argues that he did not receive "chemicals and scrub pads" and emphasizes that Officer "Rodriguez is not claiming to have personally given out these items." ECF 81 at 25. Notably, Plaintiff's argument appears to conflict with his own Complaint in which he admits he was given some "unknown liquid" for cleaning. *See* ECF 1 at 25. More importantly, he fails to create a genuine dispute as to whether inmates were given cleaning supplies at the beginning of the COVID-19 pandemic. Corrections Defendants' statement of fact is supported by Officer Rodriguez's affidavit, which appears to be based on personal knowledge even if Officer Rodriguez does not identify himself as the person who handed out the cleaning supplies in question.

[29] In his unsworn consolidated response, Plaintiff asserts that it is a "lie" that inmates can obtain more toilet paper on request. ECF 81 at 29. He maintains that while NMCD policy provides for two rolls per week, inmates are in reality only given one. *Id*. But Plaintiff does not specifically point to evidence in the record to support this claim. *See id*. While Plaintiff refers the Court to his sworn Complaint, his allegations therein fail to create a dispute of fact on this issue, as Plaintiff merely alleges that he was not provided "sufficient toilette paper" at "every prison in New Mexico." ECF 1 at 25.

Plaintiff also maintains that PNM's plumbing and HVAC systems were inadequate, resulting in a lack of temperature regulation that left cells cold during the winter and hot during the summer, caused flooding in his cell due to busted pipes, and deprived him of hot water in the winter. ECFs 1 at 25–28; 61 at UMF 27. According to Plaintiff, his unit/pod experienced flooding from June to August of 2021. ECF 1 at 27. Robert Mendoza, PNM's Physical Plant Services Manager, who was tasked with overseeing maintenance and renovations at PNM, attests that in the event of plumbing issues, PNM performed maintenance as soon as possible and always within 24 hours of the service call. ECFs 61 at UMF 33; 37-1 at 18 (NMCD_001125). Indeed, NMCD's maintenance records indicate that each time Plaintiff complained of a plumbing issue, the issue was resolved the same day.[30] ECFs 61 at UMF 34; 37-3 at 166–68 (NMCD_001623–25). Mr. Mendoza attests that PNM North received a new $2.4 million plumbing system in 2021, and that the system does not leak and does not have broken pipes.[31] ECFs 61 at UMF 32; 37-1 at 18

---

[30] In his consolidated response brief, Plaintiff again accuses Corrections Defendants of dishonesty. *See* ECF 81 at 16. He also attempts to dispute their statement of material facts concerning the resolution of plumbing issues by insisting, in his unsworn response brief, there were times when he was informed nothing could be done to fix a particular plumbing issue. *See id*. at 16, 26. Plaintiff argues that "Defendants do not log every complaint and just because someone came to look does not mean they 'fixed' anything. They did not fix anything. The problem is unfixable. It is the system that is broken." *Id*. at 26. Apart from these unsworn arguments and vague assertions, which are not evidence, Plaintiff does not point the Court to any evidence in the record that would contradict Mr. Mendoza's attestation that plumbing issues were resolved within 24 hours. Although Plaintiff appears to cite "Doc. 51, pg 14 Doc. 51 pg 17," which he suggests "shows evidence at time, from 3-16-21–6-29-21 ongoing busted pipes, over and over" [ECF 81 at 26], the documents corresponding to these citations do not relate to busted pipes or unresolved plumbing issues. *See* ECF 51 at 14, 17. Plaintiff also mentions "a dozen affidavits of potential witnesses" that he suggests corroborate his assertions. ECF 81 at 26. Having reviewed the affidavits that Plaintiff submitted in conjunction with his *Martinez* Report, the Court finds only one affidavit that discusses plumbing issues. Without indicating which facility to which he is referring, affiant Joseph Vargas states, "No proper pluming [sic]." ECF 51-10 at 17. In their Motion to Strike, Corrections Defendants maintain that Vargas's affidavit is vague and conclusory as it relates to plumbing issues. ECF 62 at 26. The Court agrees and concludes that Vargas's affidavit is insufficient to establish a genuine dispute of material fact.

[31] Plaintiff makes the conclusory assertion in his consolidated response brief that the "so called fixes made everything worse." ECF 81 at 16. He asserts that "[t]he flooding on multiple occasions, came from broke pipes on [] new swamp coolers" and "the flooding in unit one, for a month, was from the roof!" *Id*. But, once again, Plaintiff does not point to any evidence in the record to support these assertions or to contradict Defendants' statement of fact concerning PNM's 2021 installation of a new plumbing system that does not leak or have broken pipes.

(NMCD_001125). Officer Rodriguez attests that flooding "is usually caused by inmates flushing objects down the toilet."[32] ECFs 61 at UMF 31; 37-1 at 27. In addition to plumbing issues, Plaintiff alleges that there was inadequate ventilation in his cell, which led to a "moldy, musty, damp" environment that "made breathing difficult." ECF 1 at 26. But both Officer Rodriguez and Mr. Mendoza attest that there was no mold or mildew discovered in Plaintiff's cell. ECFs 61 at UMF 36; 37-1 at 19 (NMCD_001126), 26 (NMCD_001133). Like the plumbing system, the heating and cooling system at PNM North was also completely renovated in 2021.[33] ECFs 61 at UMF 35; 37-1 at 19 (NMCD_001126).

### 3.   Analysis

Emphasizing that they only bear the typical burden of a summary judgment movant *if* Plaintiff meets his burden to show a violation of a clearly established right, Corrections Defendants insist that they are entitled to qualified immunity on each count contained in Plaintiff's Complaint. At times, Corrections Defendants rest their arguments entirely on the second prong of the qualified immunity analysis (*i.e.*, clearly established). To be sure, the practice of analyzing only the second prong of the qualified immunity analysis finds support in the relevant law. *See Pearson,* 555 U.S.

---

[32] In statement of material fact 31, Corrections Defendants state: "Officer Rodriguez testified that, on one occasion, Plaintiff's pod incurred some flooding due to inmates flushing various objects down their toilets; however, the flooding was not caused by any busted pipes." ECF 61 at UMF 31 (citing ECF 37-1, Rodriguez Aff. ¶6(f) (NMCD_001131–35)). At the referenced paragraph, 6(f), Rodriguez makes an unrelated attestation: "Inmates are not allowed to have brooms, mops, or toilet brushes because they can be converted into weapons." *See* ECF 37-1 at 26. And at paragraph k of that same affidavit, Rodriguez attests: "Counsel communicated to me that Plaintiff alleges backup and flooding in Plaintiff's pod. This is usually caused by inmates flushing objects down the toilet." ECF 37-1 at 27. To the extent statement of material fact 31 recounts Rodriguez's testimony that flooding occurred on one occasion due to inmates flushing objects down toilets rather than busted pipes, neither paragraph 6(f) nor 6(k) support Corrections Defendants' statement of fact.

[33] In his consolidated response brief, Plaintiff argues that he "explained Doc. 1 plain as day 'no air coming into cells . . . hot water pipe for heat that does not work, blocked, covered up, etc. No hot water running through pipes." ECF 81 at 25. Plaintiff continues: "Defendants claim to have 'fixed' this [with] 2.4 million, wasted dollars. All []they did was put new swamp coolers in. That is the problem. Swamp coolers don't work." *Id.* at 25–26. Plaintiff's bald, unsworn assertions, which contain his opinion as to the effectiveness of swamp coolers, do not constitute admissible evidence that contradicts Corrections Defendants' statement of fact.

at 236–42. Likewise, it is the Court's prerogative to consider the clearly established prong without first determining whether a constitutional violation occurred. *See id.*

### a. Count I: Outdoor Recreation

Plaintiff alleges that Corrections Defendants violated his Eighth and Fourteenth Amendment rights by depriving him of outside recreation for 39 days at PNM and "'sporadically' due to staff prerogative" during his time in PBMP. ECF 1 at 4–6. In order to establish an Eighth Amendment violation, Plaintiff must demonstrate that (1) the conditions were "'sufficiently serious to implicate constitutional protection" and (2) the defendants acted with "'deliberate indifference.'" *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001). In order to establish a Fourteenth Amendment violation, in turn, Plaintiff must show that the alleged deprivation imposed "atypical and significant hardship[s] on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Corrections Defendants proceed directly to the clearly established prong, arguing that Plaintiff's Count I is "fatally defective"—both under the Eighth Amendment and the Fourteenth—because "[t]here is no clearly established law that a denial of outside recreation for 39 days is unconstitutional." *See* ECF 61 at 10–11 (citing *Marshall v. Morton*, 421 F. App'x 832, 838 (10th Cir. 2011); *Moore v. Little*, 785 F. App'x 609, 613 (10th Cir. 2019); *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017); *Apodaca v. Raemisch*, 864 F.3d 1071, 1079 (10th Cir. 2017); *Ajaj v. United States*, 293 F. App'x 575, 584 (10th Cir. 2008)). Corrections Defendants also take issue with what they perceive as an attempt by Plaintiff to defeat qualified immunity by broadening Count I in his consolidated response brief. *Id.*

At first blush, Plaintiff's consolidated response brief does appear to expand Count I, albeit through unsworn arguments without citations to the record. *See* ECF 81 at 8. Plaintiff purports to

"dispute[] 'facts' presented by Defendants" by claiming that he "was denied all outdoor rec *for over a year*, including the 39 days at PBMP and continues to be denied regular outside rec for the last 3+ years." *Id*. (emphasis added). Responding to this assertion, Corrections Defendants accuse Plaintiff of attempting to fashion a constitutional violation from a "new" allegation of "over a year" of outdoor recreation denials asserted for the first time in his consolidated response brief. ECF 88 at 6. But the Court cannot say that Plaintiff's "over a year" allegation is entirely untethered from the factual allegations in his Complaint. Indeed, inspection of Plaintiff's Complaint reveals the likely source of his more-than-a-year-without-outdoor-rec estimation: he alleges that "[t]he 8th Amendment is violated for failing to provide a basic human need, i.e., outside recreation, *for over a year and ongoing*," and he specifies that he was denied outdoor recreation "for 10-11 months at LCCF and PNM for 39 days." ECF 1 at 1, 5. The summation of 11 months and 39 days certainly fits Plaintiff's characterization of "over a year."  But what Plaintiff fails to appreciate is that 10-11 months of outdoor recreation denials at LCCF have no bearing on his constitutional claims against non-LCCF Corrections Defendants for independent constitutional violations he alleges took place at PNM. In other words, Plaintiff cannot simply tack on additional recreation denials *at a different facility and by different prison staff* in order to satisfy his qualified immunity burden here.

To summarize, viewing the material facts in the light most favorable to Plaintiff, he was denied outdoor recreation for 39 days at PNM. Any factual allegations related to deprivations at LCCF are not material to Plaintiff's claims here. Further, Plaintiff's allegations that he was denied outdoor recreation "'sporadically' due to staff prerogative" or "regular[ly] . . . for the last 3+ years" are conclusory and lack specific supporting facts to create a genuine issue of fact. *See Fitzgerald*,

403 F.3d at 1143. Accordingly, Corrections Defendants properly frame the issue before the Court: whether there was a clearly established right not to be deprived of outdoor exercise for 39 days.

For Plaintiff to overcome qualified immunity on this question, he bears a heavy burden to demonstrate that in depriving him of outdoor exercise for 39 days "every reasonable official would have understood that what he is doing violates" Plaintiff's constitutional rights. *See Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (quoting *Mullenix*, 577 U.S. at 11). Plaintiff's only attempt to meet this burden is a string-citation to what, in his estimation, represents "20-60 years" of "well settled law" establishing that Corrections "Defendants [are] require[d] by law to provide outdoor rec." *See* ECF 81 at 8 (citing *Perkins v. Kan. Dep't Corr.*, 165 F.3d 803, 810 (10th Cir 1999); *Gilland v. Owens*[34]; *Fogle v. Pierson*[35]; *Allen v. Sakai*[36]). Plaintiff provides no description of the cases on which he relies nor makes any attempt to explain why they constitute clearly established authority that satisfies his qualified immunity burden. Nevertheless, to the extent these cases constitute binding authrity, the Court considers whether they in fact demonstrate a clearly established right particularized to the facts of this case.

First, in *Perkins*, the Tenth Circuit was confronted with an inmate's allegation that prison officials violated his Eighth Amendment rights by depriving him of outdoor exercise for more than nine months. 165 F.3d at 805–07, 809. Beginning with the premise that the "total denial of exercise for an extended period of time . . . constitute[s] cruel and unusual punishment," the Tenth Circuit held that the district court erred in *sua ponte* dismissing the inmate's "Eighth Amendment claim

---

[34] Although he does not provide the full case citation, the Court presumes that Plaintiff is referring to *Gilland v. Owens*, 718 F. Supp. 665 (W.D. Tenn. 1989).

[35] 435 F.3d 1252 (10th Cir. 2006).

[36] 48 F.3d 1082 (9th Cir. 1994).

for deprivation of outdoor exercise" under 28 U.S.C. § 1915(e)(2)(B)(ii). *Id.* at 810 (quoting *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994)). In that same decision, the Tenth Circuit also addressed the inmate's allegation of a Fourteenth Amendment Due Process violation. *Id.* at 808–09. Again, the court held that the district court erred in *sua sponte* dismissing the inmate's claim under 28 U.S.C. § 1915(e)(2)(B)(ii), where the allegations of his complaint, accepted as true, showed confinement in an eight-foot by fourteen-foot cell for twenty-three and one-half hours per day without exercise outside his cell for over a year. *Id.* at 809.

Apart from *Perkins*, the only other in-circuit case that Plaintiff cites is *Fogle v. Piersen*.[37] In *Fogle*, the Tenth Circuit was again confronted with allegations by an inmate that his Eighth and Fourteenth Amendment rights were violated by the deprivation of outdoor exercise. 435 F.3d 1252, 1257. There, the district court dismissed as legally frivolous the plaintiff's constitutional conditions of confinement claims. *See id.* at 1257–59. The Tenth Circuit reversed with respect to the inmate's Eighth Amendment claim, finding the district court's frivolousness ruling in error, where the inmate claimed he was deprived of all *outdoor* exercise for three years, though he was not deprived of "*all* opportunity for exercise." *Id.* at 1259–60. Turning to the plaintiff's Fourteenth Amendment Due Process claim, the court held that "the district court abused its discretion in concluding that there was no *arguable* basis that a three-year period of administrative segregation" during which the inmate was denied access to any outdoor recreation and confined to his cell for

---

[37] The other cases cited by Plaintiff, *Gilland*, a case from the District Court in the Western District of Tennessee, and *Allen*, a case from the Ninth Circuit, are neither Supreme Court nor published Tenth Circuit precedent. And even considered together, they fail to demonstrate that the "clearly established weight of authority from other courts" supports Plaintiff's view of the clearly established law.

all but five hours per week, "impose[d] atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life." *Id*. at 1259 (quoting *Sandin*, 515 U.S. at 484).

The undisputed facts presented in this case (*i.e.*, that Plaintiff was denied outdoor recreation

for 39 days) do not approach the alleged duration of deprivations at issue in *Perkins* or *Fogle*, at

nine months and three years, respectively. Nor were *Perkins* or *Fogle* on similar procedural

footing. Rather, both cases were dismissed *sua sponte* by the district court on screening under

§ 1915 and based upon the allegations in the plaintiff's complaints. They did not involve the

assertion of qualified immunity or its concomitant heavy burden on the plaintiff. More importantly,

the Tenth Circuit has since discussed the implications of *Perkins* and *Fogle* on the clearly

established prong of the qualified immunity analysis, disavowing them as clearly established law

in the context of an eleven-month deprivation of outdoor exercise. *See Apodaca*, 864 F.3d at 1074

(discussing *Perkins*), 1079 n.5 (discussing *Fogle*).[38]

Reversing the trial court's denial of qualified immunity, the Tenth Circuit in *Apodaca*

clarified: "even if the alleged [eleven-month] prohibition on outdoor exercise had violated the

Eighth Amendment, the underlying constitutional right would not have been clearly established."

*Id*. at 1074. The court described *Perkins* as ambiguous as it related to constitutional claims

premised on the deprivation of outdoor exercise and concluded that it "would not render the [prison

officials] 'plainly incompetent' for failing to recognize a constitutional prohibition against an

---

[38] The Tenth Circuit observed that "*Fogle*'s discussion of the duration of the deprivation was based on the standard for frivolousness and the subjective prong of the Eighth Amendment" (*i.e.*, deliberate indifference), rather than the objective prong (*i.e.*, sufficiently serious). *Apodaca*, 864 F.3d at 1079 n.5 (citing *Lowe v. Raemisch*, 864 F.3d 1205, 1209–10 (2017)).

eleven-month ban on outdoor exercise." *Id*. at 1079. In other words, the Tenth Circuit found no clearly established law precluding qualified immunity. *See id*.

Although the Tenth Circuit in *Apodaca* restricted its analysis to an alleged violation of the Eighth Amendment, Plaintiff does not point to any binding authority that would constitute clearly established law with respect to his Fourteenth Amendment Due Process claims. Given the significant durational and procedural distinctions discussed above, neither *Perkins* nor *Fogle* qualify as such authority. Although it is not their burden to do so, Corrections Defendants point to authority supporting the opposite conclusion. ECF 61 at 10. They note that in *Marshall v. Morton*, 421 F. App'x 832 (10th Cir. 2011), the Tenth Circuit concluded that restrictions on an inmates' "recreation privileges are not different in such degree and duration as compared with the ordinary incidents of prison life to constitute property liberty interests under the Due Process Clause." ECF 61 at 10 (quoting *Marshall*, 421 F. App'x at 838). For his part, Plaintiff has failed to point to any clearly established law that would implicate a protected liberty interest to support his Fourteenth Amendment claim based upon the denial of outdoor recreation for 39 days, and the Court is not aware of any such authority.

Ultimately, the Court cannot say that the cases on which Plaintiff relies put a constitutional violation "beyond debate" in this case. *See White,* 580 U.S. at 79 (quoting omitted). Plaintiff having failed to carry his burden under the clearly established prong of the analysis, Corrections

Defendants are entitled to qualified immunity. The Court recommends dismissal of Count I on qualified immunity grounds.

b. *Count II: Conditions Amounting to Segregation or Solitary Confinement*

Next, Plaintiff asserts what the Court construes as an as-applied and facial challenge to his placement in PBMP.[39] He suggests that PBMP involves conditions amounting to "segregation" or "solitary confinement" and insists that his placement into that program was made "arbitrarily, without process" and in violation of his right to be free from cruel and unusual punishment. ECF 1 at 7–9. Plaintiff asserts claims under the Due Process and Equal Protection clauses of the Fourteenth Amendment as well as under the Eighth Amendment. *See id*. at 7. In his consolidated response brief, Plaintiff insists that despite Corrections Defendants' use of various acronyms and "fancy labels," his placement in PBMP, for all intents and purposes, was placement in "segregation for punitive purposes" for which he was never sentenced. ECF 81 at 9.

Corrections Defendants again seek summary judgment on the ground that no clearly established law supports Plaintiff's claim that his year-long stay in PBMP violated his constitutional rights. ECF 61 at 11–12 (citing *id*. at UMFs 5–17; *Rezaq v. Nalley*, 677 F.3d 1001, 1013 (10th Cir. 2012); *Schmitt v. Rice*, 421 F. App'x 858, 862 (10th Cir. 2011); *Penrod v. Zavaras*, 94 F.3d 1399, 1407 (10th Cir. 1996)).

The undisputed facts as they relate to Count II are that, following his assault of a fellow inmate, Plaintiff was housed in TRH at LCCF beginning in July 2020 until November 4, 2020,

---

[39] In this count, Plaintiff also appears to assert claims with respect to his placement in TRH at LCCF, which took place as a result of his assault on another inmate at that facility. But, once again, Plaintiff includes these allegations without naming LCCF or any LCCF staff as defendants in this lawsuit. Given the lack of personal involvement by the named defendants in this case, Plaintiff does not state a claim against them based upon his treatment at LCCF. *See Foote*, 118 F.3d at 1423. Even if he could state a claim, Plaintiff points to no clearly established law that would support a violation of his Eighth or Fourteenth Amendment rights based upon a five-month stint in restrictive housing following the assault of a fellow inmate and while pending acceptance into a program aimed at minimizing predatory behavior.

when he was transferred to PNM pending acceptance into PBMP. ECFs 61 at UMFs 13–14; 37-1 at 35 (NMCD_001142). Plaintiff received a disciplinary hearing on his underlying assault charge for which he was found guilty. ECFs 61 at UMF 10; 37-1 at 34 (NMCD_ 001141). Although he was permitted to appeal his sentence, that sentence and the sanctions were upheld, and Plaintiff received a mandatory referral to PBMP for that offense. ECFs 61 at UMFs 10, 12; 37-1 at 34–35 (NMCD_ 001141–001142). Plaintiff was placed into PBMP on November 23, 2020, where he remained for one year, until November 24, 2021. ECFs 61 at UMFs 14–15; 37-1 at 35 (NMCD_001142).

Corrections Defendants' *Martinez* Report describes the rehabilitative purpose and design of the PBMP program at PNM. *See* ECF 37 at 36. According to the Affidavit of Sharlene Hagerman, the Warden of PNM, PBMP is a "special management assignment" to which an inmate is referred "when his institutional behavior threatens the security of the institution." ECF 37-1 at 10 (NMCD_001117). "PBMP inmates are placed in a form of restrictive housing," the goal of which is to "reduce predatory behavior," including the behavior of "preying upon others through acts of violence." *Id*. The relevant NMCD policy details how living conditions within PBMP approximate those of general inmate population with clearly documented exceptions. ECF 37 at 45.

In his consolidated response brief, Plaintiff appears to rely upon a case entitled—as best the Court can discern—"*Canterino v. Wilson*," which according to his summary, "discuss[es] in great detail with expert testimony an identical 'program' and the many ways and reasons it is unconstitutional." ECF 81 at 9–10. Plaintiff argues that "NMCD and prisons have been manipulating courts for decades with . . . 'labels' for what is really 'segregation[]' [and s]ome

44

courts have recognized this and stated that 'it is the actuality of the confinement, not the label that a court must consider.'" *Id*. at 10.

In a case by the same name, *Canterino v. Wilson*, 869 F.2d 948 (6th Cir. 1989), the Sixth Circuit considered class allegations of equal protection violations at a Kentucky correctional institution for women. *See id*. The court determined that the class of inmates there did not have a protected liberty interest in a particular classification or in the facility's work or study programs. *Id*. The court further held that the prisoners failed to establish that the denial of study and work release constituted gender-based discrimination on their face. *Id*. Although the Sixth Circuit discussed a "Levels System" that was "unique to the women's prison" and that regulated "virtually every dimension of an inmate's life," the court did not determine that the system was unconstitutional. *Id*. More to the point, there is no indication that the "Levels System" at issue in *Canterino* is analogous to the PBMP program at issue here. As such, the Sixth Circuit's *Canterino* case does not constitute clearly established law in the Tenth Circuit sufficient to overcome the defense of qualified immunity.

Plaintiff also posits that PBMP's one-year minimum duration effectively meant that his 30 day, 90 day, and 6 month reviews were pointless as "'they [could] not result in an alternative placement.'" ECF 81 at 11. In support, he directs the Court to a Ninth Circuit case: *Brown v. Oregon Department of Corrections,* 751 F.3d 983 (9th Cir. 2014). In Plaintiff's assessment, *Brown* stands for the proposition that "[b]y law due process in these types of 'hearings' is violated if 'no alternative results possible.'" *Id*.

In *Brown*, an inmate brought a § 1983 due process claim against the state corrections department and its officials, alleging that his due process rights were violated when he was housed in an intensive management unit for 27 months "without periodic, meaningful review of his

status." 751 F.3d at 983–87. The Ninth Circuit held that the inmate's particular conditions of confinement in the intensive management unit (*i.e.*, no meaningful review of placement in a program for a *minimum of 106 weeks* in which the inmate was held in solitary confinement for over 23 hours per day with almost no interpersonal contact and a denial of most privileges afforded to general population inmates) implicated a protected liberty interest giving rise to procedural due process protections. *Id*. at 987. Yet, because the Ninth Circuit had not previously addressed whether such conditions of confinement gave rise to a protected liberty interest, the court concluded that the right at issue was not clearly established at the time of its occurrence and that the defendants therefore enjoyed qualified immunity. *Id*. at 989–90.

The Court is not convinced that the facts in *Brown* parallel those at issue here.  For one thing, Plaintiff spent less than half the time in PBMP that the *Brown* plaintiff spent in the intensive management unit. *See id.* at 988 (explaining that the "duration of Brown's confinement" in the intensive management unit was a "crucial factor" that "distinguish[ed]" his confinement from other forms of solitary confinement). More fundamentally, the Court cannot say that the Ninth Circuit decision constitutes clearly established law, because it was not issued by the Tenth Circuit or the Supreme Court and because it does not appear to represent the weight of authority on the relevant issue. The Ninth Circuit itself, in granting qualified immunity to the defendants in *Brown*, acknowledged that "[i]n *Sandin's* wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Id*. at 988 (citing *Sandin*, 545 U.S. at 223). Simply, *Brown* does not

constitute binding, on-point authority that clearly establishes the violation of due process rights through a one-year placement in PBMP.

Corrections Defendants, on the other hand, point to Tenth Circuit case law to support the proposition that even "undeniably harsh" conditions, in which inmates spend 23 hours per day in their cells, are permitted outdoor recreation alone in fenced in areas slightly larger than their cells, and are only permitted limited no-contact social visits each month, are "not extreme as a matter of law" and, in fact, do not implicate a cognizable liberty interest. ECF 61 at 11 (citing *Rezaq*, 677 F.3d at 1014–15). In *Rezaq*, the Tenth Circuit determined that the conditions at issue there were comparable to those routinely imposed in the administrative segregation setting, which "do not, on their own, constitute an 'atypical and significant hardship' when compared to 'the ordinary incidents of prison life.'" *Id*. at 1013 (quoting *Sandin*, 515 U.S. at 484). In reaching its ultimate conclusion that the inmates did not have a cognizable liberty interest in avoiding the conditions of confinement at issue there, the Tenth Circuit emphasized that the inmates' placements were not indeterminate and did not increase the duration of their confinement. *See id*. at 1012–16 (noting that the Supreme Court, in *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005), held that inmates had a liberty interest in avoiding confinement at Ohio's supermax facility, but "placed the weight of its analysis on the indeterminate duration of confinement and the effect the placement had on an inmate's parole eligibility"). Here, regardless of his time in PBMP, Plaintiff is serving two consecutive life sentences without the possibility of parole. *See* ECF 27 at 2. And his placement in PBMP was for a *determinate* period, as PBMP is a year-long program, which Plaintiff completed

in one year. Applying the rationale of *Rezaq* to the instant case undermines any argument by Plaintiff that there is clearly established law to support his due process claim.

And to the extent Plaintiff asserts an Eighth Amendment violation based upon his placement in PBMP, that claim fares no better in the qualified immunity analysis. Indeed, in *Grissom v. Roberts*, the Tenth Circuit found no clearly established law to support an inmate's claim that 20 years in solitary confinement constituted cruel and unusual punishment. 902 F.3d 1162, 1174 (10th Cir. 2018).

Plaintiff having failed to point to clearly established law to support his Count II claims, whether asserted under the Eighth or Fourteenth Amendments, Defendants are entitled to qualified immunity. The Court recommends that Corrections Defendants be granted qualified immunity as to Count II.

### c.  Count III: Religious Practices

Plaintiff asserts First Amendment claims against Corrections Defendants based upon the alleged denial of access to religious lands, books, icons, literature, the ability to congregate, rituals, and practice from July 18, 2020. ECF 1 at 4. He alleges that Corrections Defendants denied him "access to a priest of his faith, addresses to his priests for written communication, visits, phone." *Id*. at 12. Once again, Corrections Defendants assert that the absence of clearly established law supporting Plaintiff's claims entitles them to qualified immunity. ECF 61 at 12.

To begin, the Court observes that Plaintiff's claims in Count III are vague and ill-defined in that he fails to specify *which* religious items were purportedly withheld by Corrections Defendants and *under what circumstances*. Plaintiff reports that he is a practitioner of the Asatru/Odinist/Israelite religion. *See* ECF 1 at 12. But with the exception of "religious lands," neither his grievances nor the allegations in his Complaint specify which religious items he sought

but was denied. Chaplain Ortiz attests that he received no requests from Plaintiff to accommodate his religious practices while Plaintiff was in PBMP. ECF 37-1 at 22 (NMCD_001129).[40] Plaintiff argues in his consolidated response brief that he wrote the PNM Chaplain "several times" and chased him down to ask about services. S*ee* ECF 81 at 4. Moreover, Plaintiff alleges that he wrote PNM's chaplain to discuss religious services and to alert him that the prison library had books on religious studies but not on "information a person may specifically seek, or desire." *Id.* But Plaintiff does not support these unsworn allegations with citations to the record. Moreover, he fails to cite case law to support the proposition that failing to provide religious books on all "information a person may specifically seek or desire" constitutes a constitutional violation.

Plaintiff also argues, again in his unsworn consolidated response brief, that Corrections Defendants confiscated religious items, providing no receipt. *Id.* In particular, he contends that Sergeant Romero took, lost, threw away, and stole every item he had for religious exercise. *Id.* But, once again, he does not point to any evidence in the record to support these arguments. Plaintiff maintains that while "Indians have land with sweat lodges," those like him, who practiced Asatru, were "not allowed to go to their land and practice ceremony." *Id.* Although the undisputed evidence supports Plaintiff's claim that he was not allowed to congregate on religious lands while at PBMP [*see* ECF 37-1 at 22 (NMCD_001129)], he points to no case law suggesting that he had

---

[40] Plaintiff attempts to dispute Chaplain Ortiz's statement by pointing to a formal grievance and grievance appeal from late 2020 and early 2021, respectively. *See* ECF 81 at 3–4 ("According to Defendants and some random Chaplain Ortiz, no grievances were found as to [Plaintiff's] religious exercise. This is belied by Defendants' own exhibits and Antonetti's Exhibits in Doc. 51 pg 3 of 12, pg. 5 of 12"). In the referenced November 2020 grievance, Plaintiff claimed that he was "denied religious exercise [and was provided] no access to church, land, nothing." ECF 51-5 at 5 (of 12). The response to Plaintiff's grievance appeal, to which Plaintiff also cites, explains that the "grievance is vague [and] therefore it cannot be determined what [he] claim[s] that [he was] being denied or allowed." *Id.* at 3. The grievance and its corresponding appeal lack any signature of or reference to Chaplain Ortiz. *Id.* As such, Chaplain Ortiz's statement concerning not having received requests from Plaintiff for accommodation of religious exercise remains undisputed.

a clearly established right to do so, particularly while housed in a program that prohibited the congregation of inmates due to security concerns.

Finally, Plaintiff argues that he was "treated differently on land and religious items, services than other religions, . . . like Indians [and] Muslims [who were] allowed access to land ceremonies, various items, priests, volunteers . . ." *Id*. at 19. These allegations, like Plaintiff's other allegations underlying Count III, are vague and unsupported by evidence in the record. In addition, Plaintiff does not point to any case law to support his claims of disparate treatment concerning religious exercise.

In sum, Plaintiff's Count III claims are vague and unsupported by evidence in the record, and Plaintiff has not directed the Court to a single on-point case to demonstrate the violation of a clearly established right. He has therefore failed to carry his burden to overcome Corrections Defendants' qualified immunity defense as to Count III. *See Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (concluding that even though its independent review of the record suggested that "a case might well have been made that [the defendants] were not entitled to qualified immunity," the plaintiff's failure to point to any authority to support his claims meant that he failed to carry his burden, and the defendants were entitled to qualified immunity).

### d. Count IV: Access to Courts and Law Library

Plaintiff claims that Corrections Defendants interfered with both his access to courts and to an adequate law library and that, as a result, he was prevented from filing tort and civil rights complaints. ECF 1 at 14–16. In the instant case, Plaintiff alleges that he was denied case law, case citations, books, papers, pens, envelopes, and assistance in filing under state law. *Id*. at 14. Corrections Defendants argue that "Count IV is fatally defective because there is no clearly established law that supports Plaintiff's First and Fourteenth Amendment Claims." ECF 61 at 13

(citing *id*. at UMF 19.) They insist that *Lewis v. Casey*, 518 U.S. 343, 351 (1996) teaches that "[a]n inmate does not have a constitutional right to a law library." *Id*. As to the right of access to courts, Corrections Defendants maintain that Plaintiff provides no evidence in support of his claim and, further, that he fails to identify on-point case law establishing the violation of a clearly established right. ECF 61 at 13.

Corrections Defendants acknowledge that the law requires inmates to have "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts" and must be provided with "tools" to "attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id*. (citing *Lewis*, 518 U.S. at 351). They further observe that "[w]hile prison officials are not required to supply resources that guarantee an inmate's ability to litigate effectively, they may not 'erect barriers that impede the right of access of incarcerated persons.'" *Id*. (quoting *Apodaca v. FNU LNU*, 545 F. Supp. 3d 1051, 1061 (D.N.M. 2021)). Yet, Corrections Defendants emphasize that "[a] prisoner must demonstrate actual injury from interference with his access to the courts—that is, that [he] was frustrated or impeded in his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement." *Id*. (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010)). As to the required demonstration of actual injury, Corrections Defendants insist that Plaintiff has adduced no evidence. *Id*. (citing *id*. at UMF 20).

For his part, Plaintiff argues that he "has already provided the [C]ourt with evidence" in support of his legal access claim, citing "Doc. 51, pgs 6, 7, 8, 9, 10, 11, 12 of 25." ECF 81 at 13. The Court surmises that Plaintiff's citation refers to responses by prison staff to requests he made for legal materials ("Legal Access Responses"). *See* ECF 51-6 at 6–12. In the referenced Legal Access Responses, prison staff explain that the facility's legal access program does not have

available the following materials: "a book specific to tort claims" [*id*. at 6], "caselaw per se" [*id*. at 9], "blank paper or pens" though legal access "does provide envelopes when an inmate has qualified legal material copied for submitting it to the courts" [*id*. at 10], "[l]egal forms for other states" [*id*. at 11], and a "paralegal in site" [*id*. at 12].[41] Plaintiff insists that the "law is clear [that] supplies like pens, paper, envelopes, books for research and a law clerk able to assist us must be available." ECF 81 at 13. However, he cites no case law to support this proposition. *See id*. In addition, Plaintiff insists that he "spoke to" Sean Shannon, NMCD's Legal Monitor, but Shannon "could not give legal advice [and] was unable to tell [Plaintiff] which of his rights were being violated or even to articulate them." *Id*. at 15. But, again, Plaintiff references no on-point authority

---

[41] These documents, supplied by Plaintiff in conjunction with Plaintiff's *Martinez* Report, are the subject of Corrections Defendants' Motion to Strike Plaintiff's Exhibits. *See* ECF 62 at 3, 10–14. First, Corrections Defendants maintain, and the Court agrees, that ECF 51-6 at 8 contains inadmissible hearsay comprised of Plaintiff's out-of-court statements offered for the truth of the matters asserted therein. ECF 62 at 8 (citing *Payan*, 905 F.3d at 1171). As such, the Court disregards ECF 51-6 at 8 in its consideration of Count IV. Corrections Defendants also object to some of these documents on the ground of relevance, as "Plaintiff has intermingled documents concerning his claims in this case with claims concerning his conditions of confinement at other facilities and at other times." *Id*. at 11 (objecting on the ground of relevance with respect to ECF 51-6 at 7, 11–12). The Court agrees in part and recommends that Corrections Defendants' Motion to Strike be granted as to ECF 51-6 at 7, which includes a Legal Access Response Plaintiff received while at LCCF. As to the remaining documents, which on their face appear to be Legal Access Responses from NMCD facilities, Corrections Defendants urge the Court not to consider them without an authentication affidavit from Plaintiff. *Id*. at 10. In support of this technical authentication objection, Corrections Defendants contend that "Plaintiff presents several prison records . . . that Corrections Defendants did not discover in their comprehensive collection of the official repositories for such documents" and there are "substantial reasons to question the authenticity of many of these documents." ECF 62 at 10. Having examined the materials produced in conjunction with Corrections Defendants' *Martinez* Report, the Court finds no Legal Access Responses with which to compare those produced by Plaintiff. However, the Court notes the testimony of Sean Shannon, the former Deputy Statewide Legal Monitor for NMCD, that he provided legal forms and documents to Plaintiff at Plaintiff's request. *See* ECF 37-1 at 41. Generally, in order to be considered at the summary judgment stage, factual support must be presented "in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c). However, this is not to say that the evidence must actually be admitted or authenticated for the Court to consider it at summary judgment. *See Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009) ("We do not require an affidavit to authenticate every document submitted for consideration at summary judgment."). And notably, even in the absence of an authentication affidavit, a document may be authenticated by circumstantial evidence that suggests the document is what it purports to be. *See Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991). Here, the Legal Access Responses produced by Plaintiff appear to be in a form that suggests they are what they purport to be. And as a practical matter, the Court's consideration of these documents does not prejudice Corrections Defendants, as the Court ultimately concludes, even considering these documents, that Corrections Defendants are entitled to summary judgment as to Count IV. For all of these reasons, the Court recommends that Corrections Defendants' Motion to Strike Plaintiff's Exhibits be denied as to the subject Legal Access Responses.

demonstrating a clearly established right to receive legal advice concerning his civil rights complaints from prison personnel.

Indeed, Plaintiff appears to reference only two cases in the context of Count IV. First, he refers the Court to *Connor v. Sakai*, 15 F.3d 1465 (9th Cir. 1993), an out-of-circuit case that was later vacated in part by *Conner v. Sakai*, 61 F.3d 751 (9th Cir. 1995) as a result of the Supreme Court's decision in *Sandin*, 515 U.S. 472. In Plaintiff's view, *Connor* supports his position that the denial of access to the courts is an "ongoing, systematic issue." *See* ECF 81 at 13. The Court finds no such support in *Connor v. Sakai*, either for the proposition Plaintiff expresses or for his legal access claim in general. *See Connor*, 15 F.3d at 1469 (noting that the plaintiff submitted affidavits alleging the denial of legal materials but concluding that the plaintiff "failed to allege or offer evidence of 'actual injury'" and affirming summary judgment as to that claim).

Second, Plaintiff insists that "[i]n *Fogle v. Pierson* the 10th Circuit held that the inmate petitioner was denied access to the court in that current, ongoing case, because Fogle was denied access to the law library." ECF 81 at 19 (emphasis added). Relying on *Fogle*, Plaintiff explains that "[t]he issue here is that the law library has no books to do research, no assistance[,] and [Plaintiff] has no access to the law library at all." *Id*.

The Court does not read the Tenth Circuit's holding in *Fogle* the same way. The Tenth Circuit liberally construed Fogle's complaint at the initial frivolousness review stage, concluding that he "*allege[d]* that he was denied access to the law library, law library clerks, and jailhouse lawyers to assist him in preparing [his] case." *Fogle*, 435 F.3d at 1264–65 (emphasis added). Far from a determination that Fogle established a constitutional violation by the prison officials there, the court merely found that Fogle's legal access claim was not "indisputably meritless." *Id*. In so holding, the Tenth Circuit explained that Fogle "*alleged* that he was *completely* denied access to

53

the law library and its accompanying resources and that the denial prevented him from filing the claims in [that] case, some of which [the Tenth Circuit] deemed non-frivolous." *Id*. (emphasis added). Despite allowing Fogle's claims to proceed beyond initial review, the Tenth Circuit observed that "the Supreme Court has held that prisoners do not have 'an abstract, freestanding right to a law library or legal assistance' and therefore an inmate must 'demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.'" *Id*. at 1264 (quoting *Lewis*, 518 U.S. at 351).

In short, Plaintiff's reliance on *Fogle* is misplaced. Not only is the present case at a different stage of the litigation with drastically different burdens at play, but Plaintiff's claims themselves are distinguishable from those in *Fogle*. Plaintiff alleges that the legal materials he was provided were not sufficient or helpful in his prosecution of some unspecified legal actions.[42] *See, e.g*., ECF 81 at 13–15 (asserting that the legal materials he was provided by legal access were "inadequate" and not "helpful" and that the Legal Monitor refused to offer legal advice or "tell [him] which of his legal rights were being violated or even to articulate them"). Even construing the undisputed material facts in his favor, the Court finds that Plaintiff does not demonstrate that alleged shortcomings in the materials offered by the prison law library or legal access program hindered his efforts to pursue a non-frivolous legal claim. He points to no evidence, beyond his own bald, conclusory allegations, and to no case law that would suggest that Corrections Defendants violated his clearly established rights to access the courts. *See Gee*, 627 F.3d at 1190-91 (concluding that

---

[42] Relevant to Plaintiff's legal access claims, it is undisputed that inmates in PBMP "cannot physically come to the law library due to their special management placement" but must "obtain legal assistance and research materials through written request." *See* ECFs 37-1 at 41 (NMCD_001148); 51-6 at 6. Although Plaintiff at times states that he "ha[d] no access to the law library at all" [*see, e.g*., ECF 81 at 19], he provides no evidence to demonstrate as much, and both his arguments and the evidence he submits in conjunction with his own *Martinez* Report clarify that his dissatisfaction was not with a wholesale denial of access to legal materials but with the particular legal materials he was provided. *See, e.g.,* ECFs 51-6 at 6, 9–12; 81 at 13.

"brief delays in mailing or receiving . . . correspondence" did "not rise to the level of constitutional violations" and that the plaintiff's claims were "too conclusory to present a plausible claim that he was impeded in his effort to pursue a nonfrivolous legal claim").

Although Plaintiff makes vague allegations that he received inadequate legal materials for pursuing state and federal civil rights complaints and is therefore "feeling deterred" [*see* ECF 81 at 20], the Court takes judicial notice[43] of Plaintiff's litigation record in federal courts and in New Mexico state courts, which suggests that he enjoyed ample access to both court systems during the relevant period. Plaintiff has initiated and litigated at least the following *pro se* civil rights actions in federal court: *Antonetti v. Santistefan*, No. 1:21-CV-00279-DHU-DLM (D.N.M.) (filed Mar. 26, 2021); *Antonetti v. McDaniels*, No. 3:16-CV-00396-MMD-WGC (D. Nev.) (numerous filings by Plaintiff from 2020 to 2021); *Antonetti v. Filson*, No. 3:17-CV-00605-MMD/CLB (D. Nev.) (filings by Plaintiff in late 2020). In addition, Plaintiff has initiated and litigated numerous cases in New Mexico state courts during the relevant period and since, including: *Antonetti v. Santistevan*, D-506-CV-2020-01182 (N.M.) (initiated Oct. 19, 2020, with filings throughout 2020 and 2021); *Antonetti v. Santistevan*, S-1-SC-38774 (N.M.) (initiated March 26, 2021, with filings throughout 2021); *Antonetti v. NMCD*, D-101-CV-2021-01018 (N.M.) (initiated May 4, 2021, with filings in 2021); *Antonetti v. NMCD*, D-101-CV-2022-00492 (N.M.) (initiated Mar. 24, 2022); *Antonetti v. NMCD*, D-101-CV-2022-02046 (N.M.) (initiated Nov. 1, 2022); *Antonetti v.*

---

[43] The Court may take judicial notice of the official records of federal and New Mexico courts. *See United States v. Ahidley,* 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (judicial notice of publicly filed records in this court and other courts concerning matters that bear directly upon the disposition of the case at hand); *Shoulders v. Dinwiddie,* No. CIV-06-890-C, 2006 WL 2792671, at *3 (W.D. Okla. Sept. 26, 2006) (court may take judicial notice of "[s]tate court records available on the world wide web," including docket sheets in district courts); *Stack v. McCotter,* 79 F. App'x 383, 391–92 (10th Cir. Oct. 24, 2003) (state district court's docket sheet is an official court record subject to judicial notice under Fed. R. Evid. 201).

*Tafoya-Lucero*, D-101-CV-2022-02265 (N.M.) (initiated Nov. 7, 2022); and *Antonetti v. Hagerman*, S-1-SC-39797 (N.M.) (initiated Feb. 24, 2023).

Whereas Plaintiff fails to cite on-point authority demonstrating the violation of a clearly established right, Corrections Defendants point to case law that cuts against Plaintiff's claim. *See, e.g.,* ECF 61 at 13 (citing *Gee*, 627 F.3d at 1190; *Lewis*, 518 U.S. at 351). Plaintiff having failed to overcome his burden as to Count IV, Corrections Defendants are entitled to qualified immunity. As such, the Court recommends granting qualified immunity in favor of Corrections Defendants with respect to Count IV.

### e.  *Count V: Denial of Mail, Magazines, and Hardcover Books*

Plaintiff alleges that he was denied access to mail, magazines, and hardcover books in violation of his First and Fourteenth Amendment rights. ECF 1 at 17–24. In particular, he challenges NMCD's policy of restricting hardcover books and of restricting publications and mail based on sexual content. *See id*. at 17–22. Plaintiff also claims that, in 2021, his mail was delayed, and, further, that Corrections Defendants violated his constitutional rights by providing him with only photocopies of his confidential and legal mail. *See id*. at 23; ECF 27 at 7–8.

Corrections Defendants insist that they are entitled to qualified immunity for the following reasons: (1) "there is no clearly established law that a prison facility's prohibition of hardcover books for security reasons is unconstitutional"; (2) "Plaintiff produces no evidence that Corrections Defendants intentionally interfered with his mail or that such purported delays are attributable to them"; (3) "it is well established that restrictions on sexually explicit material in prisons are reasonably related to legitimate penological interests"; (4) Plaintiff identifies no clearly established law that states it is unconstitutional for prison facilities to provide inmates only with copies of their legal and privileged mail, security reasons notwithstanding." ECF 61 at 15.

56

Plaintiff's claim related to hardcover books is easily resolved. The Court begins with the premise that although inmates have a First Amendment right to access information, this right may be restricted to further legitimate penological interests. *See Thornburgh v. Abbot*, 490 U.S. 401, 401 (1989). And in the Tenth Circuit, "there is no bright-line constitutional rule prohibiting prison officials from restricting inmates' receipt of hardbound books from publishers or vendors based on security concerns." *See Whitehead v. Mgm't & Training Corp.*, 524 F. Supp. 3d 1155, 1170–71 (D.N.M. 2021) (surveying Tenth Circuit and Supreme Court law on the matter and discerning no bright-line constitutional rule with respect to hardbound books). Critically, Plaintiff has pointed to no legal authority that would suggest otherwise. At most, he offers vague allegations unsupported by evidence. *See* ECF 81 at 4–5, 24 (arguing that Corrections Defendants have advanced "lame" and "absurd" reasons related to the denial of hardcover books and suggesting, without pointing to evidence in support, that the facility provides hardcover books for school). Plaintiff having cited no clearly established law to support the alleged violation of a constitutional right by virtue of a prison's restrictions on hardcover books for security reasons, he fails to satisfy his qualified immunity burden.

With respect to Plaintiff's allegation that Corrections Defendants interfered with his mail, the Defendants' *Martinez* Report uncovered no evidence of intentional interference [ECFs 61 at UMF 20; 37 at 50–52; 37-1 at 29–32 (NMCD_001136-39), 38–43 (NMCD_001145–50)], and Plaintiff does not point to any evidence to controvert Corrections Defendants' statement of fact on this matter. Rather, Plaintiff merely advances arguments in his unsworn consolidated response brief related to mail delays and his speculation as to the reasons for those delays. *See* ECF 81 at 5, 22–24. He highlights no case law establishing that unintentional delays in a prison's mail system violate an inmate's constitutional rights. And the persuasive authority relied upon by Corrections

Defendants is to the contrary. *See* ECF 61 at 15 (citing *Payne v. Werholtz*, No. 10-3177-SAC, 2010 WL 4103000, at *1 (D. Kan. Oct. 18, 2010) (concluding that a two-week delay in mail delivery does not rise to the level of a constitutional violation); *Bruscino v. Pugh*, 232 F. App'x 763, 764 (10th Cir. 2007) (reasoning that a three-week delay in mail delivery, absent any indication of improper motive, does not rise to a constitutional violation)). Accordingly, Corrections Defendants are entitled to qualified immunity as to this claim.

Bearing in mind that restrictions on the receipt of mail by inmates do not violate the inmate's constitutional rights so long as they are reasonably related to legitimate penological interests, *see Thornburgh*, 490 U.S. at 413–19, the Court turns to Plaintiff's challenges to PNM's policy of restricting sexually explicit material. Pursuant to policy, material that includes sexually explicit depictions of partial or total human nudity is not permitted within NMCD facilities. ECFs 37 at 65; 37-2 at 130 (providing that "[p]hotographic images of sexually explicit content that by its nature or content poses a threat or is detrimental to the security, good order or discipline of the facility, detrimental to inmate rehabilitation, or that facilitates criminal activity" will be rejected).

In his consolidated response brief, Plaintiff makes unsupported allegations, at times couched as "expert opinion," to the effect that there is no "legitimate security interest in depriving inmates photos of girls, men, 'whatever', in bikinis, lingerie, etc." and, further, that the "denial of photos of lovers, girlfriends et. al. <u>do</u> in fact encourage rape and homosexual behavior." ECF 81 at 21. Plaintiff further contends that the definition of obscenity has evolved over time and that, for instance, there is no evidence that certain sex positions are "offensive, repulsive, 'shock[] the conscience of any NMCD staff, or the majority of Americans." *Id*. at 22. None of these arguments are supported by evidence in the record.

In terms of case law, Plaintiff insists that, in *Thornburgh*, the Supreme Court held that censorship "solely for being sexual" is unconstitutional. *Id*. at 6. Arguing that NMCD policies effectively ban mail and publications for being sexual, Plaintiff maintains that they run afoul of *Thornburgh*. *Id*. (citing *Thornburgh*, 490 U.S. at 404–05, 414–19). But the Supreme Court's decision in *Thornburgh* is more nuanced than Plaintiff's characterization suggests.

In *Thornburgh*, a class of inmates challenged regulations promulgated by the Federal Bureau of Prisons which related to prison officials' rejection of incoming material and publications. 490 U.S. at 403. Under the applicable BOP regulations at issue there, the warden could not reject a publication solely on the basis that it was sexual or repugnant but only if he determined that it was "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Id*. at 405. Nevertheless, the Supreme Court acknowledged the potential for certain publications, including those that were sexual in nature, to produce "coordinated disruptive conduct." *Id*. at 412–13. Applying the reasonableness standard established in *Turner v. Safely*, 482 U.S. 78 (1987), the Court determined that the BOP regulations concerning incoming publications were facially valid. *See id*. And significantly, *Thornburgh* effectively set out the standard for censorship of publications in the prison context: regulations are "valid if they are reasonably related to legitimate penological interests." *Id.* at 413 (quoting *Turner*, 482 U.S. at 89).

Since *Thornburgh*, the Tenth Circuit addressed the constitutionality of a jail's ban on sexually explicit material in *Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007). The *Jones* court specifically considered the principles discussed in *Thornburgh* and reached the conclusion that a ban on sexually explicit material "protects the safety of jail personnel and other inmates," which constitute "legitimate government objectives" to which "[t]he ban is rationally related."

*Jones*, 503 F.3d at 1155–56. The Tenth Circuit reasoned that "to allow inmates to possess 'sexually explicit material' . . . would have a significant impact on the safety and security of prison personnel and other inmates," and where the plaintiff had identified "no alternative that fully accommodate[d] his rights while at the same time imposing *de minimis* cost to valid penological interests" the jail's ban on sexually explicit material "pass[ed] constitutional muster." *Id*. at 1156.

In light of *Jones*, and with a closer reading of *Thornburgh*, the Court concludes that Plaintiff has not cited clearly established law to support his constitutional claims related to the prohibition on sexually explicit material.  He therefore fails to meet his qualified immunity burden with respect to the prohibition on sexually explicit material.

Finally, as to Plaintiff's claim that providing him with only photocopies of his confidential and legal mail violates his constitutional rights, the Court has already observed that the relevant case law does not support his position. *See* ECF 27 at 7–8 & n.8 (citing *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004), in which the Tenth Circuit observed that "[i]nmates have a First Amendment right to receive information while in prison"—but only "to the extent the right is not inconsistent with prisoner status or the legitimate penological objections of the prison"; *Turner*, 482 U.S. at 89, in which the Supreme Court noted that "when a prison regulation impinges on inmates' constitutional right[]" to receive information, "the regulation is valid if it is reasonably related to legitimate penological interests"; *Gee*, 627 F.3d at 1187, in which the Tenth Circuit reached the same conclusion; and *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), in which the Supreme Court stated that courts must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"). Following the Court's conclusion that "Plaintiff is not likely to succeed in proving that NMCD's

policy of providing inmates with only scanned copies of their mail is constitutional" [ECF 27 at 7], Plaintiff has not come forward with any case law to support his claim. Nor has he offered any facts or evidence to establish a constitutional violation in this regard. Put simply, he has not met his qualified immunity burden.

For all of these reasons, the Court recommends that Corrections Defendants be granted qualified immunity with respect to Count V.

> f.   Count VI: Denial of Cleaning Supplies, Toilet Paper, Adequate Ventilation, and Proper Plumbing

Plaintiff alleges that Corrections Defendants violated his Eighth Amendment rights when they denied him access to cleaning supplies, adequate ventilation and climate control, and a properly functioning plumbing system. ECF 1 at 25–28. In Corrections Defendants' view, Plaintiff's claims are "fatally defective because [he] lacks evidence that Corrections Defendants' conduct violated his Eighth Amendment rights." ECF 61 at 16 (citing *id*. at UMFs 25–28). More particularly, they insist that Plaintiff points to no evidence to demonstrate deliberate indifference to his health or safety.

Corrections Defendants observe that an inmate attempting to establish an Eighth Amendment violation must show that he was "incarcerated under conditions posing a substantial risk of serious harm" and that prison officials had a "sufficiently culpable state of mind." *Id*. at 17 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)). Showing a substantial risk of serious harm requires "more than a conclusory claim of being afraid and aggravated." *Riddle v. Mondragon,* 83 F.3d 1197, 1205 (10th Cir. 1996). An inmate must show "a deprivation that is, objectively, sufficiently serious" based on specific circumstances. *Id*. at 1205-06. Here, Corrections Defendants insist that Count VI must be dismissed because "Plaintiff failed to demonstrate a genuine dispute of fact as to whether any prison official showed deliberate

indifference to his health or safety." ECF 88 at 12 (citing ECF 61 at 16–18; *Grissom*, 902 F.3d at 1173).

First, with respect to Plaintiff's claim that he was deprived of adequate cleaning supplies, Corrections Defendants point to a NMCD policy under which inmates are not supplied with objects that could reasonably be used as weapons, such as brooms, mops, and toilet brushes. ECFs 61 at UMF 28; 37 at 86; 37-1 at 24–28 (NMCD_1131-35). Plaintiff does not highlight any evidence that would contradict this policy or its security-related purpose; instead, he offers the conclusory argument that "Defendants call 'everything' a 'security threat.'" ECF 81 at 4. As to other cleaning supplies, the undisputed evidence before the Court is that, at the onset of the COVID-19 pandemic, inmates at PNM were provided green pads and germicide to clean their cells in order to increase the level of sanitation. ECFs 61 at UMF 29; 37 at 86; 37-1 at 24–28 (NMCD_001131–35); *see also* ECF 1 at 25 (Plaintiff asserting that he was "rarely [given] some unknown liquid" for cleaning). Even viewing the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to demonstrate that Corrections Defendants were deliberately indifferent to his health and safety when they withheld brooms, mops, and toilet brushes or provided green pads and germicide. Moreover, Plaintiff has not cited any case that would suggest that this specific conduct related to the provision of cleaning supplies has been established as a constitutional violation. Corrections Defendants are entitled to qualified immunity as to this claim.

A similar analysis applies to Plaintiff's claim that he received insufficient toilet paper. Plaintiff makes the conclusory allegation that Corrections Defendants' failure to provide him with "sufficient toilette paper" caused wounds to his body [*see* ECF 1 at 25], but he fails to dispute the testimony of Janine Rodriguez, the Statewide Grievance and Disciplinary Appeals Manager, who attested that inmates receive one roll of toilet paper per week, plus an additional roll upon request,

and that they are also permitted to purchase additional rolls through the commissary. ECFs 61 at UMF 30; 37 at 86; 37-1 at 26–27 (NMCD_001133–34). Once again, even viewing the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to show that show that Corrections Defendants were deliberately indifferent to his health and safety when they provided up to two rolls of toilet paper per week with the ability to purchase additional toilet paper through the commissary. Nor has Plaintiff cited on-point authority that would suggest that this specific conduct has been clearly established as a constitutional violation. Corrections Defendants are entitled to qualified immunity as to this claim.

Relying on his sworn Complaint, Plaintiff alleges that PNM's plumbing system left cells cold during the winter and hot during the summer, caused flooding in his cell due to busted pipes, and deprived him of hot water in the winter. ECFs 61 at UMF 27; 1 at 25–28. He further alleges that his unit/pod experienced flooding from June to August of 2021. ECF 1 at 27. But Plaintiff offers nothing more than these conclusory allegations in support of his claim that Corrections Defendants were deliberately indifferent to his health or safety. Corrections Defendants, on the other hand, submit undisputed evidence showing that in the event of plumbing issues, PNM performed maintenance as soon as possible and always within 24 hours of the service call. ECFs 61 at UMF 33; 37-1 at 18 (NMCD_001125). They also present undisputed evidence that each time Plaintiff complained of a plumbing issue, the issue was resolved the same day and, further, that in 2021 PNM North received a new $2.4 million plumbing system that does not leak or have broken pipes. ECFs 61 at UMF 34; 37-3 at 166–68 (NMCD_001623–25). Even viewing the undisputed evidence in the light most favorable to Plaintiff, the Court finds that he fails to show that he was deprived of adequate plumbing in deliberate indifference to his health or safety. Plaintiff having

failed to show a violation of his Eighth Amendment rights, Corrections Defendants are entitled to qualified immunity.

Plaintiff's claims of inadequate ventilation and climate control suffer the same fate as his other conditions of confinement claims. In his sworn Complaint, Plaintiff makes the conclusory and speculative allegations that inadequate ventilation in his cell, due to faulty repairs and "fix[es]" of the facility's swam coolers, led to a "moldy, musty, damp" environment that "made breathing difficult." ECF 1 at 26. But the undisputed evidence reveals that there was no mold or mildew discovered in Plaintiff's cell. ECFs 61 at UMF 36; 37-1 at 19 (NMCD_001126), 26 (NMCD_001133). And, like the plumbing system, the heating and cooling system at PNM North was also completely renovated in 2021. ECFs 61 at UMF 35; 37-1 at 19 (NMCD_001126). Viewing the evidence in the light most favorable to Plaintiff, the Court finds that he fails to show that he was deprived of adequate ventilation in deliberate indifference to his health or safety, and Corrections Defendants are entitled to qualified immunity as to this claim.

The Court acknowledges that, in support of his allegations in Count VI, Plaintiff asserts that "PNM is identical to the conditions in *Ramos v. Lamm*, 639 F.2d 559 (1980)[,]" *superseded by PLRA as stated in Shook v. Board of County Commissioners of County of El Paso*, 216 F.R.D. 644 (D. Colo. 2003), *rev'd*, 386 F.3d 963 (10th Cir. 2004). ECF 81 at 26. According to Plaintiff, *Ramos* indicates that "swamp coolers don't work" and "requires intake [and] outtake vents in cells" and "heat in winter and cool air in summer." *See* ECF 81 at 28. In reply, Corrections Defendants argue that "[w]hile *Ramos* discusses the standard living conditions of prisons, it does not discuss swamp coolers." ECF 88 at 13.

Even apart from *Ramos's* failure to mention swamp coolers, the Court is not otherwise persuaded that the case constitutes clearly established law supporting Plaintiff's constitutional

claims. The Tenth Circuit in *Ramos* found constitutional violations based upon the "totality of conditions" at a particular prison facility. *See Ramos*, 639 F.2d at 562. Although the court did observe that the facility's heating and ventilation system provided inadequate temperature control or ventilation, the facility had *numerous* problems beyond that. *See id*. at 567–72. For instance, the facility had sewage accumulation in cells, rodent and insect infestations, trash and decayed food littering the cells and corridors, exposed electrical wiring, broken cell windows, stained and soiled bedding, excessive mold and fungus growth, obsolete and unsanitary kitchen facilities, and cells that were barely one-half the square footage of the space required by modern correctional standards. *Id*. In contrast, the undisputed evidence before the Court as to Plaintiff's conditions of confinement at PNM do not approach the egregious conditions described by the Tenth Circuit in *Ramos*. As such, *Ramos* fails to demonstrate that the specific conduct at issue here has been clearly established as a constitutional violation.

In sum, the Court concludes that Plaintiff has neither pointed to evidence showing a violation of his Eighth Amendment rights while housed at PNM, nor cited on-point clearly established law with respect to his claims in Count VI. The Court recommends that Corrections Defendants be granted qualified immunity as to Count VI.

## V. CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that:

1. Plaintiff's Motion for Recusal [ECF 50] be **DENIED**;

2. Plaintiff's Motion to Strike Counter Motion to Strike [ECF 94] be **DENIED**;

3. Plaintiff's Motion for Protective Order [ECF 97] be **DENIED**;

4. Corrections Defendants' Motion for Partial Summary Judgment to Dismiss Plaintiff's Claims for Failure to Exhaust Administrative Remedies [ECF 57] be

**GRANTED IN PART** and that Counts VII and X of Plaintiff's Complaint be **DISMISSED WITHOUT PREJUDICE**;

5. Corrections Defendants' Motion to Strike Exhibits from the Summary Judgment Record [ECF 62] be **GRANTED IN PART AND DENIED IN PART** as discussed herein and **DENIED AS MOOT** in all other respects;

6. Corrections Defendants' Motion for Summary Judgment to Dismiss Plaintiff's Civil Rights Complaint on Qualified Immunity Grounds [ECF 61] be **GRANTED** and Counts I, II, III, IV, V, VI, and VIII be **DISMISSED WITH PREJUDICE**; and

7. Corrections Defendants' Motion for Partial Summary Judgment on Plaintiff's First Amendment Claims [ECF 58], Corrections Defendants' Motion for Partial Summary Judgment to Dismiss Plaintiff's Eighth Amendment Violation Claims [ECF 60], and Corrections Defendants' Motion for Partial Summary Judgment on Plaintiff's Fourteenth Amendment Claims [ECF 59] be **DENIED AS MOOT**.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

66